**Emma Ree MACK, Plaintiff,**

v.

**KENT COUNTY VOCATIONAL AND TECHNICAL SCHOOL DISTRICT, Defendant.**

**Civ. A. No. 88–223 MMS.**

United States District Court,
D. Delaware.

Feb. 19, 1991.

Leonard L. Williams, Wilmington, Del., for plaintiff.

Roger D. Landon, of Heckler & Cattie, Wilmington, Del., for defendant.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

This is an employment discrimination action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff Emma Ree Mack is a black woman who was employed by defendant Kent County Vocational and Technical School District (the "School District") as a cosmetology instructor. The School District is an agency of the State of Delaware. At all times material to this suit the School District employed more than fifteen employees and is an employer engaged in an industry affecting commerce within the meaning of 42 U.S.C. §§ 2000e(b), (g), and (h). This court has jurisdiction pursuant to 42 U.S.C. § 2000e-5(f)(3). Plaintiff contends that she was dismissed from her position with the School District on account of her race. The case was tried before the court without a jury from October 29, 1990 to October 31, 1990, and on November 2, 1990. Post-trial briefing was completed on January 2, 1991. This opinion constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. *Findings of Fact*

Plaintiff is a qualified cosmetologist. From 1966 to 1969, she held a State of Alaska license for cosmetology salon management and during that time completed 2,000 training hours for cosmetology and 600 training hours for cosmetology instruction. She subsequently acquired a Delaware State license for the management of a cosmetology establishment and for cosmetology instruction. In 1976, plaintiff completed a bachelors of science in distributive education at Delaware State College. (DX 2, Permanent Record Card of Delaware State College; A–18–19).[1] Plaintiff attended and continues to attend seminars and other special training programs in cosmetology. (A–19). Plaintiff has also worked in various beauty salons in the United States. (A–20–22).

In 1969, plaintiff secured a position as a cosmetology instructor with the School District at the Kent North School located in Dover, Delaware. In 1971, the School District terminated plaintiff because of an insufficient number of students enrolled in cosmetology classes.[2] (A–24–25). After the completion of a second school for the School District at Woodside, Delaware (the "Kent South School"), plaintiff applied for and obtained a position as a cosmetology instructor in 1977. Plaintiff assumed her duties as a cosmetology instructor in September 1977 until her discharge in June 1986. (A–25–27). At the time of her discharge, plaintiff had attained tenured teacher status pursuant to 14 *Del.C.* § 1403. (Amended Pretrial Order and Memorandum, Docket Item ("D.I.") 27, p. 3.).

Conflict with and criticism by the administration of the Kent South School marked plaintiff's second period of employment with the School District. On October 9, 1981, one of plaintiff's students locked her locker combination inside her locker and was unable to obtain the protective clothing which cosmetology students were required to wear during classroom activities. Plaintiff refused to give the student the locker combination and instructed her to

---

**1.** Hereinafter, the trial transcript will be referred to as "A–, B–, C– or D–___", the designation being the transcript for individual days of trial; plaintiff's and defendant's exhibits will be referred to as "PX ___" and "DX ___", respectively.

**2.** After her discharge, plaintiff filed a complaint against the Kent County Vocational–Technical School, and against Martha Bailey and Jeanette Hall, who were presumably employees of the School District, with the Delaware State Human Relations Commission on May 14, 1971. Her complaint alleged, *inter alia,* racial discrimination and that two other cosmetology department members contradicted her instruction to students and objected to her methods of teaching. (DX 2, Complaint dated May 14, 1971). The record does not indicate the decision of the Delaware State Human Relations Commission.

write an essay as punishment. The student went to Principal Arthur Fauntleroy,[3] explaining the circumstances of plaintiff's refusal to provide her with her locker combination. (DX 1, Tab 3, pp. 134–35; PX 1, Tab Z, pp. 3–5). In the belief that the student's time would best be spent involved with classroom activities (DX 1, Tab 3, p. 136), Fauntleroy instructed the student to return to class and to inform plaintiff that she should provide the student with the locker combination. When the student returned to the classroom, plaintiff refused to produce the locker combination. Thereafter, Fauntleroy sent plaintiff a written directive instructing her to give the locker combination to the student. Plaintiff continued to refuse Fauntleroy's directive. (DX 1, Tab 3, pp. 134–135; PX 1, Tab Z, pp. 3–5). Fauntleroy then telephoned plaintiff and repeated his directive, which plaintiff once again refused. (PX 1, Tab Z, p. 5). Fauntleroy arranged a conference with himself, plaintiff and Dr. Thomas Inter, then Superintendent of the School District, in an attempt to have plaintiff comply with his directive. Plaintiff refused to provide the locker combination even upon the directive of Inter. (*Id.*). Because of this refusal, Inter suspended plaintiff for three days without pay for insubordination. (DX 2, Letter of October 9, 1981; PX 1, Tab Z, p. 6). Plaintiff appealed the discipline imposed upon her to the Board of Education of the School District (the "Board") on October 14, 1981. On November 25, 1981, the Board affirmed the discipline. (PX 1, Tab Z, p. 8).

During the 1982–83 school year, Fauntleroy learned that plaintiff conducted her classes by dictating from her textbook, a method which he found to be ineffective. Fauntleroy informed the plaintiff that he would order cosmetology textbooks for the students so that plaintiff would not need to conduct her class by dictation and so that her teaching efficiency would be enhanced. When the textbooks arrived, plaintiff failed to distribute them to the students. When Fauntleroy learned of this two months later, he had to order the plaintiff to distribute the textbooks to the students. (DX 1, Tab 3, pp. 146–147). Fauntleroy subsequently testified that he believed plaintiff was not receptive to his instructions or recommendations for improving her teaching skills, and that plaintiff's attitude was fairly obstinate against receiving any form of criticism. (DX 1, Tab 3, pp. 149–50).

On January 24, 1983, William Garey, Pupil Personnel Supervisor of the Kent South School, entered plaintiff's classroom and questioned her about certain possible errors in her student lists. Mr. Garey was looking for a student named Martha Bryant for whom plaintiff signed a drop sheet[4] on December 9, 1982 in order to remove that student from her roll. (DX 1, Tab 4, p. 163; PX 1, Tab G). However, Martha Bryant was still maintained on plaintiff's roll and was attending plaintiff's class at the time of Garey's visit. Plaintiff responded in an uncooperative and argumentative manner when confronted with this information. Upon further investigation, Garey learned that plaintiff was still carrying on her roll another student, Sheila Wilson, and was marking her absent although plaintiff had already signed a drop form for that student on January 6, 1983. When Garey presented this information to plaintiff, she engaged in a shouting match with Garey before the class. (PX 1, Tab G; DX 1, Tab 4, pp. 164–165). During trial, plaintiff testified that she felt that Garey had no authority to enter her classroom and approach her on this matter. (A–114).

On April 26, 1983, the Personal Committee of the Board met with plaintiff in order to evaluate her teaching performance. (DX 2, Memo dated April 22, 1983). On May 13, 1983, Inter, on behalf of the Board, wrote a letter to plaintiff, informing her that there was "a lack of motivation, respect, cooperation, and ability to follow direction with students" in her classroom and laboratory. Inter further noted that

---

3. Arthur Fauntleroy was principal of the Kent South School from 1976 until his retirement in 1983 (DX 1, Tab 3, p. 133.).

4. A "drop sheet" is an administrative form which a teacher must sign indicating the teacher's awareness that a student is no longer enrolled in the Kent South School.

the goals and objectives of plaintiff's cosmetology program "seemed weak, with little or no provision for a favorable learning environment for the students." The letter directed plaintiff to take immediate corrective action regarding improvement of student evaluations, elimination of rewards for negative behavior, and updating of cosmetology instructional materials. Inter's letter also recommended that her instructional program be changed to include progress charts for all classroom and laboratory instruction areas; to provide additional time for students with learning problems; to reward positive student behavior; to conduct exit interviews with students who transfer from her class; to seek administrative help in her instructional program; and to follow administration directives. The letter warned plaintiff that if her "instructional program and student evaluations did not improve, the situation will be reviewed again and appropriate action will be taken." (PX 1, Tab M). During trial, plaintiff stated that she was unable to understand or implement the recommendations set forth in Inter's letter of May 13, 1983. (B–33–34). Plaintiff also felt that she had no problems with her instructional methods. (B–34).

Student/parent dissatisfaction with plaintiff also developed during this period. In the course of the 1981–82 school year, the administration received several parental complaints about plaintiff regarding her teaching performance and relationship with the students. (DX 1, Tab 3, pp. 141–143; PX 1, Tabs J, K and 1). These complaints concerned such incidents as plaintiff's sending out deficiency notices when a student's performance was not deficient, failure to respond to parental phone calls, inconsistency in grading and discipline, spending time on non-class matters, and lack of student-teacher rapport. (DX 1, Tab 3, pp. 140–145; PX 1, Tabs J, K and L). Dissatisfaction was so intense that a student, Cindy Spencer, or her parents, circulated a petition seeking plaintiff's dismissal. (C–80).

These complaints regarding plaintiff's capabilities continued during the 1982–83 school year. During that time, Barbara Challies, parent of one of plaintiff's students, led a group of ten to fifteen white parents seeking to secure the discharge of plaintiff. A parent of another of plaintiff's students, Patricia Lankford, believed that these parents opposed plaintiff on account of her race. (B–80). This group met with Fauntleroy to express their dissatisfaction with plaintiff's abilities as a cosmetology instructor. Fauntleroy expressed his sympathy with the parent's dissatisfaction and expressed his own hope to see the plaintiff discharged at some point.[5] (B–79–81). The court finds it is not credible that this group of parents demonstrated any racial animus against plaintiff to Fauntleroy, who is black. (D–243).

During trial, several former students of plaintiff testified that some white students were negatively inclined to plaintiff on account of her race. Sherry Durant, a student of plaintiff during the 1981–82 school, claimed that she heard white students occasionally refer to the plaintiff with racial epithets. (C–78). Patricia Lankford indicated that her daughter felt that plaintiff could not teach general cosmetology which would be of use to white patrons because of plaintiff's race. (B–77, B–80). Patricia Tucker, a white student of plaintiff during the 1982–83 school year, testified that some white students were not impressed with plaintiff because of her race. (B–104). Kristina Young, a black student of plaintiff during the 1982–83 school year, testified that some white students did not like plaintiff because they assumed a black cosmetology instructor was unable to teach about white people's hair. (B–121). Ms. Young also heard frequent racial epithets regarding plaintiff by white students. (B–125). Philip Rynders, a former student at the Kent South School who graduated in 1984, testified that throughout his three years at

---

**5.** In 1981, Fauntleroy recommended the termination of plaintiff to Charles Hoff, who was then the Superintendent of the School District. (DX 1, Tab 3, pp. 157–158). However, Hoff disregarded Fauntleroy's recommendation and directed him to work with the plaintiff and try to improve her instructional skills. (*Id.*, p. 153).

the school, he would be sporadically sent to the plaintiff's class when one of his instructors fell ill. Rynders testified that he heard some white students refer to the plaintiff in derogatory racial terms. (B–199). Faith Foster Whaley, a student of plaintiff during the 1985–86 school year, testified during trial that white students and parents were disinclined towards plaintiff because of her race. (C–10–11). While it is impossible to determine the extent or frequency, the court finds that throughout plaintiff's second period of employment with the School District, racial prejudice was exhibited by some white students towards plaintiff.

In the fall of 1983, Donald Andersen replaced Fauntleroy as principal of the Kent South School, a position which he held until August 1986.[6] Upon assuming his duties at the school, Andersen informed the faculty that with regard to written reprimands for minor events, he would not follow the Incident Policy adopted by the Board on May 25, 1982. (PX 4; C–124–125). The Incident Policy enumerated the manner by which teachers would be reprimanded or disciplined when they neglected their professional duties. (PX 4). Discipline would be meted out to teachers in accordance with the severity of the infraction.[7] During his three years with the school, Andersen did not utilize the Incident Policy with respect to the issuance of written reprimands on minor incidents regarding any teacher. (C–124–126).

In order to learn more about the Kent South School, Andersen visited teachers in their classroom and observed their teaching methods during the first few weeks of the school year. (C–118). On September 20, 1983, Andersen wrote plaintiff a letter suggesting various techniques to improve her instruction method. The letter directed her to "develop some lesson plans, using the group instruction method ..." which would enhance her effectiveness, and to use twenty minutes per day in each of her classes for practical application of material that had been covered in her lectures. (PX 1, Tab N). Andersen also observed in the same correspondence the "the building of rapport [with plaintiff's students] is [plaintiff's] biggest problem, without some kind of a mutual relationship, teaching is very difficult." (*Id.*).

During trial, Andersen elaborated upon why he recommended the group instruction method of teaching to plaintiff. When he visited plaintiff's classroom, Andersen observed plaintiff misapplying an individualized teaching method.[8] Plaintiff instructed the students to read a chapter from their textbook and individually called students to her desk to answer verbally questions at the end of the chapter. While each student was answering the questions, other students simply waited at their desk for their turn to approach plaintiff's desk and answer the same questions which they just heard being answered by their classmates. Andersen told plaintiff that this method was incorrect for implementing individualized instruction. (C–119–121).

Throughout the 1983–84 school year, Andersen continued to work with plaintiff in order to improve her instructional abilities. Andersen spent more than one-half of his time working with plaintiff and one other instructor than he did with all other instructors at the school. (C–123). Andersen observed that while plaintiff would get along well with some of her students, she had difficulties establishing rapport with a majority of the students enrolled in her

---

**6.** Andersen was away from the school during the 1984/85 school year until January 1985.

**7.** For example, the theft or willful destruction of school property valued over $50 would result in a recommended discharge. For failure to implement the School District's policies, the Superintendent's regulations, the Kent South School's rules or a requisite student disciplinary procedure, the first infraction would result in a written reprimand. The second infraction would result in suspension without pay for one to five days. The third infraction would entail an administrative hearing, and the fourth infraction would result in recommended dismissal. (*See,* PX 4).

**8.** Individualized instruction is an educational term of art which calls for initial instruction of the class as a group and then individual instruction for students who either had problems or excelled in their studies.

cosmetology classes. Andersen raised this matter with the plaintiff throughout the year; however he only saw minor improvement on the part of plaintiff. (C–126). In Andersen's view, plaintiff's lack of rapport with her students was her biggest problem during Andersen's first year. (C–141–142).

During the 1983–84 school year, Andersen also observed that the plaintiff's writing style and grammar in letters sent to parents were deficient. When Andersen informed plaintiff of this, she agreed to provide her letters to Andersen for proofreading prior to mailing. (C–131–132).

In the first few months after he became principal of the Kent South School, Andersen received parental complaints concerning plaintiff's performance of her duties. On November 14, 1983, Barbara Challies wrote a letter to Andersen, complaining of plaintiff's professional capabilities. (PX 1, Tab O). On November 22, 1983, Andersen met with plaintiff, Barbara Challies and her daughter, Lucinda Challies. During the meeting, plaintiff dealt with Mrs. Challies' complaints in an argumentative manner. The meeting eventually devolved into an emotional outburst between Mrs. Challies and plaintiff. (*Id.*). Andersen was disappointed with plaintiff's lack of professionalism during the Challies conference. (D–216).

After the meeting with Mrs. Challies, plaintiff informed Andersen that she believed there were a number of parents who were trying to get plaintiff fired from the school, that the students of these parents were in her second and third year classes, and that these students were prejudicing incoming students against plaintiff. (C–144). Plaintiff had not conveyed to Andersen her belief that the sentiments of these students and parents arose on account of her race. (D–35). During the spring of 1984, Andersen decided for the forthcoming school year, all second and third year cosmetology students would be sent to the Kent North School so that plaintiff would instruct only first year students who would not have had any previous instruction under plaintiff. (C–145). In this fashion, Andersen hoped to remove those students who

were hostile to plaintiff and that she would have an opportunity to cultivate better relations with incoming first-year cosmetology students. (C–130, C–145). The court finds Andersen's explanation fully credible.

On April 2, 1984, Andersen evaluated plaintiff's performance of her professional duties for the foregoing school year. (PX 1, Tab R). During trial, Andersen testified that he had given plaintiff a relatively good evaluation in order to give her incentive to continue improvement. (C–143). He further believed that although plaintiff had demonstrated some improvement, he was not fully satisfied with the level of her performance. (C–143–144).

As the 1983–84 school year drew to a close, two incidents occurred in plaintiff's class which resulted in minor physical injury to two students. On April 26, 1984, Teresa Peace, a student of plaintiff, had a permanent straightener applied to her hair during plaintiff's afternoon class. On the next day, Teresa complained of burns on her scalp. The school nurse, Mildred C. Plumley, determined that Teresa's hair and skin had been burned by certain solutions applied during plaintiff's class. Thereafter, Teresa was taken to a professional cosmetologist so that the chemicals could be washed from her hair. The school paid for the expenses incurred by Teresa at the cosmetologist's salon. (PX 1, Tab Q).

On June 13, 1984, Linda Edwards, mother of Julie Edwards, wrote a letter to Andersen complaining of an incident on May 3, 1984, where portions of her daughter's hair were burned during plaintiff's class. Mrs. Edwards complained of the indifference demonstrated by plaintiff toward this event and expressed her belief that plaintiff was utilizing improper techniques in her classroom instruction which were not suited to the hair of whites. (PX 1, Tab S). Without some immediate explanation by plaintiff to the students and/or parents of these students, the injuries inflicted during plaintiff's class constitute legitimate parental grievances against plaintiff.

At the beginning of the 1984–85 school year, plaintiff had instituted a disciplinary policy which she had disseminated to her

students and the parents of her students, noting that, *inter alia,* plaintiff would send a student to the principal for disciplinary action when the student in question had incurred five disciplinary infractions or if the student instigated a severe disruption in the classroom, such as the infliction of physical harm or the destruction of property. Plaintiff's disciplinary policy also provided that students who failed to wear their classroom uniforms would received a grade of zero for that class day and no credit hours. (PX 1, Tab T).

During the first half of the 1984-85 school year, Assistant Principal Richard Goewey assumed Andersen's responsibilities as principal of the Kent South School. On October 24, 1984, plaintiff called the principal's office and asked Goewey to remove ten students from her morning class and one student from the afternoon class for not wearing their classroom uniforms. On October 31, 1984, Goewey wrote a letter to plaintiff reprimanding her for this incident. (DX 1, Tab 7, pp. 263-271; PX 1, Tab T). In his letter, Goewey observed that (a) plaintiff failed to conduct a student/teacher conference with any of the students before calling his office,[9] (b) plaintiff failed to follow her own disciplinary policy with regard to the students, and (c) if plaintiff had followed her own disciplinary policy, especially with regard to students who were out of uniform for the first time, Goewey would not have had to engage in "so many unecessary [sic] and uncalled for individual student conferences." (*Id.*). Goewey also noted that the students were prepared to accept a grade of zero for that class day as per plaintiff's disciplinary policy and that consequently, there was no need for the administration's involvement with the incident. (*Id.*).

Students enrolled in a vocational program with the School District are sent from academic-oriented "home schools" for their vocational classes at either the Kent South School or the Kent North School. When the morning vocational classes are finished, the students are obliged to return to their home school for their academic classes. On October 30, 1984, Goewey sent plaintiff an Incident Report, faulting plaintiff for retaining three students for cosmetology activities during home school time without permission from the principal's office. (PX 1, Tab I).

In January 1985, Andersen returned to the Kent South School and continued his efforts to improve plaintiff's instructional capabilities. (C-146). Andersen spent proportionally as much time with plaintiff during his second year as during the first. (*Id.*). At the end of the 1984-85 school year, Andersen prepared a second evaluation of plaintiff in which he observed that plaintiff had made some general improvement, (PX 1, Tab U); however, Andersen still felt that plaintiff had not improved her rapport with her students. (C-150-151). Plaintiff admitted that she did not understand Andersen's criticisms about her rapport with students and did not know what measures to take to improve rapport. (B-55-56).

Andersen used the official year-end evaluations to evaluate plaintiff on a relative rather than an absolute scale in order to encourage plaintiff to improve her instructional skills and rapport with the students. (C-143, C-209, D-121). Andersen's evaluations were based upon his observations of plaintiff with respect to herself and not in relation to other teachers. (C-210). Andersen gave plaintiff "generously good" evaluations in order to motivate her. (D-66, D-121).

The School District requires that all internal funds be deposited upon receipt on a daily basis and not be held by the instructor or students. (C-116). Plaintiff had failed to abide by that regulation several times during her employment with the School District. (PX 1, Tabs D and E; C-116-117). In several instances occurring between January 1986 and March 1986, plaintiff has accumulated amounts of money from her students' classroom sales activities and deposited these amounts at one time, instead of making daily deposits as required by the School District. (DX 2,

---

**9.** Goewey noted that such conferences are often   the only necessary step for minor disruptions.

Memorandum dated March 18, 1986; PX 3, p. 10).

During the 1985–86 school year, an institutional change arose with respect to termination decisions. Previously, Andersen as principal of the Kent South School and Inter as Superintendent of the School District jointly made termination decisions based upon Andersen's evaluations. Beginning with the 1985–86 school year, decisions regarding termination were made by a committee of four consisting of Andersen, Goewey, Robert Lykens, administrative assistant for the School District, and Joseph M. Orlando, Superintendent for the School District.[10] (D–62–64).

In February 1986, there was an administrative meeting of Andersen, Goewey, Lykens, and Orlando to discuss, *inter alia,* plaintiff's future with the school. (C–167, C–170). Andersen had compiled a list of areas of improvement for plaintiff. These areas consisted of rapport with students, handling of records, and instructional activities. (C–168). Andersen had wanted to inform plaintiff that she would have to achieve improvements in these areas within a certain time framework in order to avoid termination. (C–170). Andersen hoped that plaintiff would have at least another year of employment with the school so that she would have an opportunity to improve. (*Id.*). While a final decision had not been made, the three other officials at this administrative meeting felt that plaintiff should be terminated at the end of the 1985–86 school year. (*Id.*). Andersen believed that the other administration officials differed with him because they had more experience with plaintiff over the years and presumably as a consequence, they were less inclined to be patient with plaintiff's deficiencies. (C–181–182).

On March 11, 1986, plaintiff became embroiled in a physical confrontation with three white cosmetology students. (C–153, PX 1, Tab W). For several weeks, the cosmetology students were planning to stage a fashion show. (PX 1, Tab W). Two students, Shonna Hobbs and Kelly Reynolds, began a discussion on this subject with plaintiff and questioned her about her inability to attend certain practice sessions. The discussion gradually escalated into an argument between plaintiff and another student, Pamela Lane. (*Id.*). After class, plaintiff directed Pamela Lane to come to her office and explain why she was being disrespectful. (*Id.;* PX 2, Tab 1, p. 60). The office was visible to the students in the classroom through a large window. Pamela Lane and plaintiff entered into an argument about Pamela's behavior. (*Id.*). As this battle of wills increased, Pamela began to lose control over her emotions and attempted to leave plaintiff's office. Plaintiff used force to prevent Pamela from opening the door of the office and leaving. When so restrained, Pamela burst into tears. (*Id.*). Upon seeing Pamela cry, Kelly Reynolds forcefully entered the office to retrieve Pamela. Shonna Hobbs followed Kelly Reynolds into the office. Plaintiff became engaged in a physical scuffle with Kelly Reynolds and Shonna Hobbs. (PX 1, Tab W; PX 2, Tab 2, p. 103; C–58). Shortly thereafter, a fourth student, Carla Norris, entered the office and the scuffle ended. (PX 1, Tab W).

After the incident, plaintiff called the principal's office and reported to Lykens that Pamela Lane had been disrespectful to her.[11] Plaintiff did not mention that other students were involved. (DX 1, Tab 2, pp. 28–29, 36). Lykens asked Pamela Lane to come to the office and after briefly discussing the incident with Pamela Lane, Lykens set up a conference for the following morning with Pamela, her mother, Carolyn Lane, plaintiff and Andersen.

Plaintiff prepared a disciplinary referral for Andersen and Lykens concerning Pamela Lane, Kelly Reynolds and Shonna Hobbs. (PX 1, Tab W). The disciplinary referral was a standard form listing various disciplinary infractions. Plaintiff

---

**10.** Orlando replaced Inter as superintendent of the School District beginning with the 1985–86 school year.

**11.** Andersen was not at the Kent South School that day because he was required to provide testimony in family court regarding a Kent South School student.

checked off blank spaces indicated that the three students were annoying to classmates, rude and discourteous, restless and inattentive, engaged in excessive talking and mischief, and uncooperative. (*Id.*). Plaintiff did not include any reference to the physical scuffle.

On March 12, 1986, there was a meeting with plaintiff, Andersen, Pamela Lane and Carolyn Lane. During the meeting, Pamela, under instructions from her mother, apologized to the plaintiff. Plaintiff did not fully apprise Andersen of the extent of involvement of other students or the physical scuffle during the meeting. (PX 1, Tab W; C–154–155; D–160). After the meeting, four students met with Andersen and informed him that plaintiff had physically attacked a student. (PX 1, Tab W). Because Andersen had to appear again in family court, he made an appointment to discuss this matter with them on the following morning. (*Id.*; C–155).

On March 13, 1986, Andersen met with Shonna Hobbs, Kelly Reynolds and Kelly's guardian, Mrs. Avis Simpkins. During the meeting, Andersen was informed that, on March 11, there was a fight among plaintiff, Kelly and Shonna. Andersen then met with plaintiff and directed her to provide him with a full report of the incident. Thereafter, Andersen interviewed all the students who witnessed the incident. (PX 1, Tab W).

On March 18, 1986, Andersen and Lykens each sent official reprimands to plaintiff. Andersen's reprimand faulted plaintiff for not fully notifying him of the events which took place on March 11. Andersen emphasized that as an experienced teacher, plaintiff should have understood that the administration had to be fully and immediately apprised of the disturbance and that plaintiff should have prepared a detailed report as quickly as possible, especially in light of the physical contact made between plaintiff and the students. Implicit in Andersen's reprimand letter was the belief that plaintiff's preparation of a standard disciplinary referral was not sufficient to apprise the administration of the incident. Lykens' reprimand similarly faulted

plaintiff's "non-professional" manner in verbally reporting her account of the disturbance. Lykens stated that plaintiff's "willful omission of facts made [plaintiff's verbal] report misleading, and incorrect to the point that the seriousness of this incident went unknown to the administration until the following day." Lykens also observed that plaintiff's actions on March 11 were a violation of the policy of the School District and the inaccuracy of her report was a neglect of duty. (PX 1, Tab W).

As a result of the March 11 incident, several parents of students telephoned or wrote letters to the administration protesting plaintiff's behavior and expressing their intent to remove their children from the vocational program at the Kent County Vocational–Technical Schools. (C–162, D–186). Because of intense parental concern and protest, Andersen, without any input from plaintiff, effected an administrative transfer of students whereby students could transfer to the cosmetology classes taught by Anita Eastman, a white woman instructor at the Kent North School. (C–162–163). During trial, Andersen testified that in light of the parent's determination to remove their children from the vocational program, such administrative transfer would enable the students to complete the school year in the area of their vocational training. Otherwise, a year's worth of training would have been lost to the students. (*Id.*). The court finds Andersen's administrative transfer of the fourteen students a reasonable response to the existing circumstances.

A total of fourteen students transferred from plaintiff's morning cosmetology class to the Kent North School. All the students who transferred were white. (A–134). Only five students remained in the plaintiff's morning cosmetology class. (*Id.*; DX 1, Tab 2, p. 43; D–187). Three of the remaining five students were white. (A–134). The students who were involved with the March 11, 1986 incident were not disciplined other than a verbal reprimand. (D–183).

During the March 11, 1986 incident, an adult patron, Betty Rue, was in the class-

room having her hair styled.[12] On January 27, 1976, the Board had adopted a regulation that all visitors must report to the school office and register. (C–105; PX 1, Tab A). Plaintiff felt that she was not obliged to ascertain whether visitors had compiled with this regulation. (A–121–123). Mrs. Rue had not properly registered with the office upon her arrival. (PX 3, p. 17; C–108). In the absence of an express directive that teachers were responsible for confirming visitors had registered with the school office, plaintiff cannot be faulted.

The March 11, 1986 incident convinced the administration officials to terminate plaintiff's employment at the end of the 1985–86 school year. (C–168). By letter conforming to the requirements of 14 *Del.C.* § 1410, dated April 28, 1986, the Board notified plaintiff of its intention to terminate her employment as of June 30, 1986.[13] Plaintiff exercised her rights under 14 *Del.C.* § 1413 and elected to have a private hearing before the Board. This hearing was held over five nights during the summer of 1986. By Decision and Order dated August 6, 1986, the Board issued its findings of fact and conclusions of law. Based on those findings of fact and conclusions of law, the Board found the plaintiff guilty of several incidents of misconduct in office, incompetency, and neglect of duty and voted five to one to terminate her services. (PX 3). Holly Topoloski, a white woman, was hired to replace plaintiff as cosmetology instructor in the Kent South School for the 1986–87 school year. (D–85).

Plaintiff appealed the decision of the Board to the Superior Court of the State of Delaware. On May 20, 1987, the Superior Court held that there was substantial evidence in support of the Board's termination of plaintiff for neglect of duty. (DX 3, p. 5). The Superior Court did not address the other grounds for termination found by the Board. Plaintiff did not appeal the decision of the Superior Court.

In September 1986, plaintiff filed an employment discrimination charge with the Office of Civil Rights of the United States Department of Education alleging discrimination based upon race and gender. (Amended Pre–Trial Order and Memorandum, D.I. 27, Paragraph 3(f)). The Philadelphia District Office of the Equal Employment Opportunity Commission investigated the charges of race and gender discrimination and on November 5, 1987 found no violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e–2 *et seq.*) and concluded that the Board's decision to terminate plaintiff's employment was based solely upon her inability to perform her duties as a teacher over a lengthy period of time. (PX 5). The Philadelphia District Office further found that with respect to plaintiff's allegations that accusations against her were made by students and parents who were white, the evidence did not support her claim since both blacks and whites participated in expressing their concerns about plaintiff's performance. (PX 5). The United States Equal Employment Opportunity Commission reviewed the Philadelphia District Office's decision and subsequently issued a determination adverse to plaintiff. (Amended Pre–Trial Order and Memorandum, D.I. 27, Paragraph 3(h); PX 6).

After her discharge, plaintiff sought cosmetology instructor positions within the New Castle County School District in the late summer of 1986, at the Sussex County Vocational–Technical School District during the spring of 1987, with a school district in Maryland during the summer of 1987, and with a private beauty school in Claymont, Delaware. (A–166–169). Although she has worked part-time in the New Castle County School District as a substitute

---

**12.** Plaintiff has frequent visitors to her classes who were patrons who had their hair done by the students.

**13.** On April 28, Andersen prepared his final evaluation of plaintiff, in which he noted that plaintiff needed to make improvements in the areas of student rapport, management of admin-

istrative matters, instructional skills, language usage and her ability to cooperate with others. In the evaluation, Andersen also observed plaintiff "needs to improve her methods of handling student discipline problems and must keep the office informed when problems arise in her classroom." (PX 1, Tab X).

teacher and as a beautician with the Paree Claree Salon in Dover, Delaware, she has not made any other efforts to obtain a teaching position because of time spent preparing for this case. (A–170). During trial, plaintiff testified that a licensed cosmetologist can expect to earn $15,000 to $20,000 per year working in a private beauty salon. (B–176–177). Plaintiff has not attempted to secure such employment because she believes that she is overqualified for such a position. (A–165).

When Andersen became principal at the school, he informed the teachers that they may send students to his office for disciplinary purposes; however he further requested that the teacher inform him of the reasons why the student was being sent to him through either a telephone call or a note. (C–136–137). Without such information, Andersen had no means to determine the nature or severity of the problem. (*Id.*). Plaintiff generally did not follow Andersen's request that he be informed about the reason. (C–137). She did not enforce her own disciplinary policy and sent students to Andersen's office for minor infractions. (C–138–139, C–149). Plaintiff believed that Andersen should take punitive action on every student that she sent to him although Andersen had informed her that before he could take disciplinary measures, he would need to know what transpired and then determine what sort of disciplinary action should be taken. (D–26–27). By the second year, plaintiff sent three times as many students to Andersen than those from any other class. (C–149). No other teacher in the Kent South School had difficulties in informing Andersen of the reasons for sending a student to his office. (D–20).

During trial, plaintiff alleged that her disciplinary problems with students were attributable to a failure on the part of the administration to provide her with the same degree of disciplinary support as that afforded to non-minority teachers. (Amended Pretrial Order at p. 9). Faith Foster Whaley, one of plaintiff's students during the 1985–86 school year, testified that the discipline imposed upon students sent to the office by plaintiff was ineffective. (C–18–19). Kristina Young, a student during the 1982–83 school year, also believed that administrative support discipline was ineffective and because of that ineffectiveness, students felt that they could misbehave with impunity. (B–123). Lydia White, a parent of one of plaintiff's students during the 1983–84 school year, observed an administrative official take no disciplinary action against three students sent to the principal's office by plaintiff. (B–138).

The testimony of these witnesses arguably suggests that the administration might have been lax with regard to disciplining students. However, at trial, plaintiff did not present any evidence that the administration provided plaintiff with less disciplinary support than that imposed upon students referred by white teachers for similar disciplinary infractions.[14] Further, plaintiff had no firsthand knowledge of the discipline imposed upon students sent to the principal's office by white teachers. (A–151). Moreover, other black instructors at the Kent South School did not have the kinds of disciplinary problems that plaintiff alleges she had with white students. (D–39).

At some point during the 1985–86 school year, the administrators of Kent South School hired Michael Coverdale, who is white, as a career counselor. (D–105–106). At the time, Michael Coverdale was under a six-month suspension without pay from the Lake Forest School District for assaulting a student. (*Id.*). In an evaluation prepared by Gerald S. Lysick, Superintendent of the Lake Forest School District for the Kent County Vocational Technical School District, Lysick stated:

---

**14.** During trial, plaintiff testified that another black teacher, Patricia Cooper, also was not provided sufficient student disciplinary reinforcement from the administration. The evidence does not reveal the reasons why Patricia Cooper sent students to the principal's office (A–152–153), or if the level of discipline imposed was less than that meted out to students sent by white teachers. Given these proof deficiencies, the court concludes plaintiff's testimony regarding Patricia Cooper does not aid plaintiff's position.

Mr. Coverdale has given evidence of being unable to follow the Lake Forest School District's policy on discipline. This has led to his present status of being on suspension without pay from June 11, 1985 until the beginning of the second semester, January 1986. Mr. Coverdale has recorded satisfactory observations and evaluations as a teacher in the Lake Forest School District since July 1, 1974 through June 1, 1985.

In the evaluation, Lysick also noted that he would reappoint Michael Coverdale to his previous position. (PX 9). During trial, no evidence was presented as to the specific circumstances which lead to Coverdale's suspension from the Lake Forest School District.

The evidence concerning Michael Coverdale is of little value since the circumstances surrounding Coverdale's suspension from the Lake Forest School District were not sufficiently established so as to permit the court to draw a meaningful conclusion. Further, while expressing misgivings about Coverdale's emotional poise and adherence to the disciplinary policy of the school district, Superintendent Lysick affirmatively stated in his evaluation that he would recommend Coverdale's reappointment.

## II. *Analysis*

Title VII makes it unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin. . . .

42 U.S.C. § 2000e–2(a).

Absent direct evidence of purposeful discrimination, a Title VII plaintiff may estab-

lish discriminatory intent through the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined by *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The *Burdine* court summarized this framework as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

450 U.S. at 252–53, 101 S.Ct. at 1093 (citations omitted). The ultimate burden of persuasion that the defendant intentionally discriminated against the plaintiff remains upon the plaintiff. *Id.,* at 253, 101 S.Ct. at 1093.

In *McDonnell Douglas,* the Supreme Court enumerated the following elements of a prima facie case of discrimination in hiring: (1) the plaintiff is a member of a protected class; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) after his rejection the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. 411 U.S. at 802, 93 S.Ct. at 1824. These elements must be modified somewhat here to conform to the claim of discrimination in the discharge of an employee.[15] For a discriminatory discharge, the

---

**15.** The Supreme Court has noted as facts necessarily will vary in Title VII cases, these precise elements of a prima facie case will not be necessarily applicable in every respect to differing factual situations. *See McDonnell Douglas v. Green,* 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13. The Third Circuit Court of Appeals has

further cautioned courts to avoid stubborn, mechanical analysis of all Title VII factual scenarios through the framework enunciated in *McDonnell Douglas:*

Simply put, a Title VII plaintiff has established a prima facie case when sufficient evidence is offered such that the court can infer

Third Circuit Court of Appeals has held that a Title VII plaintiff may make a prima facie showing by demonstrating that (1) he is a member of a protected class, (2) he was qualified for the position from which he was discharged, and (3) others not in the protected class were treated more favorably. *Weldon v. Kraft, Inc.* 896 F.2d 793, 797 (3d Cir.1990); *Hankins v. Temple University,* 829 F.2d 437, 440 (3d Cir.1987). The prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

### A. *Plaintiff's Prima Facie Case*

The School District maintains that plaintiff has failed to discharge her burden of establishing a prima facie case by a preponderance of the evidence. The School District concedes that plaintiff is an African–American and consequently is a member of a protected class. However, the School District contends (1) the doctrine of collateral estoppel bars plaintiff from asserting that she was qualified to be a cosmetology instructor; (2) even if plaintiff is not collaterally estopped, plaintiff has failed to produce sufficient evidence at trial to establish that she was qualified; and (3) plaintiff has not established that others in the non-protected class were treated more favorably. The court will address these issues seriatim.

#### 1. *Collateral Estoppel*

It is well-settled law that the doctrine of collateral estoppel applies in Title VII cases. *See Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Goldsmith v. DuPont Construction Corp.,* 571 F.Supp. 235 (D.Del.1983). In *Kremer,* the Supreme Court held that the statutory directive of 28 U.S.C. § 1738 compels a federal court to provide the same full faith and credit to a state court judgment upholding a state agency's rejection of an employment discrimination claim that would apply in the state's own courts. Consequently, the court must determine whether under Delaware law the Delaware courts would provide preclusive effect to the Superior Court's decision.

Delaware law provides that in order to invoke collateral estoppel, there must be a determination of an issue essential to a final judgment which precludes relitigation of that issue in a subsequent suit on a different cause of action between the same parties or their privities. *Tyndall v. Tyndall,* 238 A.2d 343, 346 (Del.1968); *Foltz v. Pullman, Inc.,* 319 A.2d 38, 40 (Del.Super. Ct.1974). In *Foltz,* the court gave collateral estoppel effect to a decision of a state agency even though that decision was not appealed to and reviewed by a state court. *Id.* at 42. It follows, *a fortiori,* from *Foltz* that a decision of a state court rendering final judgment on an appeal from a Board of Education decision would be given preclusive effect in the Delaware courts, and as a consequence, this court is obliged to provide preclusive effect to the issues determined by the Superior Court. *See Goldsmith v. DuPont Construction Corp.,* 571 F.Supp. 235 (D.Del.1983).

The School District contends that the Superior Court decision bars plaintiff from establishing a prima facie case. It argues that since the Superior Court upheld the Board of Education's determination that plaintiff is incompetent, she is precluded from asserting that she was qualified to be a cosmetology instructor.

The School District's characterization is incorrect for two reasons. First, the questions before the Superior Court were (1) whether there was substantial evidence to support the decision of the Board of Education and (2) whether plaintiff's allegation of bias on the part of the Board of Education was supported by the evidence.[16]

that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons. *EEOC v. Metal Service Co.,* 892 F.2d 341, 348 (3d Cir.1990) (citations omitted.)

16. With respect to the second claim before the Superior Court, plaintiff argued on appeal to the

The Superior Court reviewed the evidence with respect to the Board's findings of misconduct in office, neglect of duty and incompetency and held that "there is substantial evidence to sustain the Board's finding that the appellant was guilty of neglect of duty" and that therefor the Board was entitled to determine that termination was the appropriate action. The Superior Court did not affirm the Board's termination decision on the basis of substantial evidence to sustain a finding of incompetency. Since the Superior Court did not speak to the issue of incompetency, plaintiff is not precluded from establishing by a preponderance of the evidence that she was qualified to be a cosmetology instructor.

Second, even if one were to read the finding of neglect of duty as identical to a finding of incompetency, the issue before the Superior Court was whether there was substantial evidence to support the Board's findings with the burden of persuasion upon the School District. In this court, the issue is whether plaintiff has established her prima facie case by a preponderance of the evidence. Consequently, the court holds plaintiff is not collaterally estopped from claiming that she was qualified for the reason that the issue before the court is different from that affirmed by the Superior Court.

### 2. Qualification Element in a Prima Facie Title VII Case

■ As an alternative argument, the School District contends that the qualification element of a prima facie Title VII case requires plaintiff to show that she was performing at a level which satisfied her superiors and that evidence submitted during trial by both parties establishes that she failed to perform at such a level.

The court should not consider the School District's subjective evaluation of plaintiff's performance in determining whether plaintiff has established her prima facie

case. The Third Circuit Court of Appeals has held that while federal courts should generally consider objective job qualifications in evaluating whether the plaintiff has made out a prima facie case, subjective performance evaluations are best left to the later stage of the *McDonnell Douglas* analysis. *Weldon v. Kraft, Inc.,* 896 F.2d 793, 798 (3d Cir.1990). Subjective evaluations "are more susceptible of abuse and more likely to mask pretext." *Fowle v. C & C Cola,* 868 F.2d 59, 64 (3d Cir.1989). To deny the plaintiff an opportunity to move beyond the initial stage of establishing a prima facie case because of employer dissatisfaction with employee performance would improperly prevent the court from examining this dissatisfaction and determining whether it has been used as a pretext. The School District's proposed subjective standard of employer satisfaction in determining a Title VII plaintiff's qualifications collapses the entire *McDonnell Douglas* analysis into a single initial step at which all issues are resolved. *Weldon v. Kraft, Inc.,* 896 F.2d at 799; *see also Fowle v. C & C Cola,* 868 F.2d at 64. The court will consider the School District's dissatisfaction with plaintiff as witnessed by reprimands and the Board's findings in the context that these evaluations were a pretext for racial discrimination and unworthy of credence in the section of this opinion which addresses pretext. *See infra,* pp. 379–381.

The School District concedes that plaintiff possessed the necessary educational background and experience for a cosmetology teacher. *See* D.I. 60, pp. 5–6. The court finds for the purposes of establishing her prima facie case, plaintiff was qualified.

### 3. Preferential Treatment for Non–Protected Class Members

As already noted above, the *McDonnell Douglas* framework was never intended to

court that the fairness of the Board was questionable in light of the testimony of Ms. Henrietta Taylor, a patron of plaintiff's class, who stated that she had been told by the school janitor, Irving Tribbitt, that Lykens told Tribbitt that the Board decided to fire plaintiff before the termi-

nation hearing. Both Lykens and Tribbitt, testifying during the Board's termination hearing, denied that such statements were made. The Superior Court held that plaintiff failed to provide any evidence of actual bias or of prejudicial, improper behavior by the Board.

be applied in a rigid, mechanical manner. *Furnco Construction Corp.* 438 U.S. at 577, 98 S.Ct. at 2949. The burden of establishing a prima facie case of disparate treatment is not onerous. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The School District contends that plaintiff has not established that members of the non-protected class were treated more favorably since evidence was submitted during trial that at least one white instructor·was terminated during Andersen's tenure as a principal of the Kent South School.

During trial, Andersen could only vaguely recall that some unnamed white instructor was discharged during his second, or possibly first, year at the Kent South School. (D–79). Further, Andersen did not provide any details of the circumstances surrounding the termination of this unnamed white instructor. Because no evidence was provided from which the court could draw an inference that this unnamed white instructor was a similarly situated employee, the court finds Andersen's testimony on this prior termination to be of no aid.

■ Nonetheless, it is plaintiff and not the School District who has the burden of demonstrating others not in the protected class were treated more favorably. Plaintiff has not proffered even a scintilla of evidence to meet her burden. Consequently, I hold plaintiff has failed to establish a prima facie case by a preponderance of the evidence because of a failure to prove non-minority teachers were treated more favorably.

■ This opinion should properly end here because of plaintiff's failure to establish her prima facie case. The third element of a plaintiff's prima facie case has consistently been part of the law articulated by the Third Circuit Court of Appeals in Title VII cases. Recent examples are *Hankins v. Temple University,* 829 F.2d 437 (3d Cir.1987); *Jackson v. University of Pittsburgh,* 826 F.2d 230 (3d Cir.1987), *cert. denied,* 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988); *Bellissimo v. Westinghouse Electric Corp.,* 764 F.2d 175 (3d Cir.1985), *cert. denied,* 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986).

However in 1989, the Court of Appeals in *Williams v. Giant Eagle Markets, Inc.,* 883 F.2d 1184 (3d Cir.1989), a Title VII discriminatory discharge case, stated the plaintiff "had only to establish a prima facie case by showing (1) that she was a member of the protected class; (2) that she satisfied the normal requirements of the job she held; and (3) that she was discharged from her position of employment." 883 F.2d at 1191. Under this formulation, the Court of Appeals apparently dispensed with the necessity for plaintiff to establish as part of her prima facie case the element of preferential treatment for similarly situated non-minority employees and substituted in its place only that plaintiff be discharged from her position. *See* 883 F.2d at 1192 n. 11. Under this unique formulation, plaintiff has established a prima facie case. It follows this court will have erred in holding plaintiff has failed to make out a prima facie case.

The problem is compounded because six months later, the Court of Appeals returned to the original formulation of a prima facie case in *Weldon v. Kraft,* 896 F.2d 793 (3d Cir.1990). Thus, under the most recent formulation of the elements of plaintiff's prima facie case, this court's holding with respect to plaintiff having failed to establish a prima facie case would be correct. Since the Court of Appeals' formulations of what constitutes a plaintiff's prima facie case yields diametrically opposed holdings, it is prudent to proceed with the *McDonnell Douglas* analysis.

### B. *Defendant's Burden of Production for a Legitimate and Nondiscriminatory Reason for the Discharge*

Moving to the second prong of the *McDonnell Douglas* analysis, the School District must carry its burden of production and come forward with sufficient evidence of a nondiscriminatory reason for its termination of plaintiff. "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to

conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096. The burden of persuasion remains upon plaintiff and the School District is not required to persuade the court by a preponderance of the evidence that legitimate, nondiscriminatory reasons for the challenged employment action existed. *Id.*, at 259–60, 101 S.Ct. at 1096–97.

The School District has articulated legitimate, nondiscriminatory reasons for discharging plaintiff both in the Board's findings supporting the discharge and at trial. Plaintiff (1) taught her classes in a deficient manner, as demonstrated by the findings of the Personnel Committee of the Board, (2) failed to improve her rapport with students, (3) refused to obey the direct reasonable order of Fauntleroy regarding the locker combination incident, (4) failed to follow her own disciplinary procedures with regard to students who refused to wear their uniforms, (5) placed herself in a situation which led to a physical scuffle with three students, (6) failed to make a full, accurate and timely report concerning the March 11, 1986 incident, (7) violated the School District's policies regarding discipline during the March 11, 1986 incident by failing to send Shonna Hobbs and Kelly Reynolds to the principal's office for discipline, (8) violated the School District's policy with regard to student drop lists, as demonstrated by the incident with Garey, (9) failed to render assistance to Teresa Peace after her complaints of scalp burns, (10) failed to properly supervise her class as demonstrated by the Linda Edwards burned hair incident, (11) retained three students in her classroom during "home school" time, and (12) failed to comply with the School District's policy requiring daily deposits in the internal account of monies collected in her classroom. *See* PX 3 at pp. 18–20.

The School District has submitted evidence of plaintiff engaging in an assorted pattern of conduct over time which justified discharge on the grounds of neglect of duty, misconduct in office and incompetency. The court holds the School District has

articulated legitimate, nondiscriminatory reasons for plaintiff's discharge.

### C. *Plaintiff's Burden of Demonstrating Proffered Reasons Are Pretextual*

The court having found the School District's asserted reasons for discharging plaintiff were legitimate and non-discriminatory, plaintiff must carry the burden of persuasion that her discharge resulted from intentional discrimination. The inference of discrimination arising from the prima facie case dissolves when the employer comes forth with a legitimate, nondiscriminatory reason for its actions. *Mousavi v. Beebe Hospital of Sussex County, Inc.*, 674 F.Supp. 145, 152–53 (D.Del.1987) (citing *Smithers v. Bailar*, 629 F.2d 892, 895 (3d Cir.1980). Plaintiff's burden of persuasion may be met either directly by persuading the court that a discriminatory reason more likely motivated the School District or indirectly by showing that the School District's proffered explanation is not worthy of credence. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095 (citing *McDonnell Douglas Corp v. Green*). Plaintiff must do so by a preponderance of the evidence. *See id.*, at 250, 101 S.Ct. at 1092. By asserting and attempting to show that the School District's reasons were "pretextual," plaintiff has chosen the latter method, presumably because direct evidence was not available.

In urging pretext, plaintiff points to (1) the Board's failure to follow the Incident Policy during the termination hearings, (2) the Board's failure to provide proper weight to Andersen's evaluations during the termination hearing, (3) the absence of administrative support in disciplinary matters, and (4) administrative capitulation to parental pressure against plaintiff on account of her race.

Plaintiff contends that the Board terminated her in violation of the Incident Policy since there was no finding by the Board that plaintiff had engaged in the physical abuse of a student resulting in severe harm

during the March 11, 1986 incident.[17] However, the Board found plaintiff's actions during the incident to be lacking for other reasons. Specifically, the Board believed that plaintiff should have terminated the dispute with the students before it reached such uncontrolled proportions. Plaintiff did not send the two students who engaged in the physical scuffle to the principal's office. Further, plaintiff failed to apprise the administration in a detailed and timely manner as expected of an experienced teacher. Moreover, these failures arising from the March 11, 1986 incident were not the sole grounds for plaintiff's termination but were regarded in the context of a long-standing pattern of misbehavior and inability to implement improvements. (See, PX 3 at pp. 18–20).

Plaintiff also claims that the Board deliberately ignored the absence of written reprimands for minor infractions on plaintiff's part in order to facilitate her termination. However, Andersen testified the Incident Policy regarding written reprimands was ignored with respect to all instructors employed at the Kent South School. The court accepts Andersen's explanation in lieu of evidence to the contrary. The Board's use of the Incident Policy and the lack of prior written reprimands do not show the Board's findings to be pretextual.

Plaintiff also contends that her relatively good evaluations from Andersen also establish the pretextual nature of the Board's findings. However, there was a multitude of evidence before the Board of plaintiff poorly executing her professional duties as a high school instructor over a prolonged period. To reiterate several examples, plaintiff exhibited a persistent inability to implement improvements in her teaching skills or to improve her rapport with her students. Plaintiff failed to implement her own disciplinary procedures or to adhere consistently to the procedures outlined by Andersen. Plaintiff exerted lax supervision over her classroom such that two students incurred minor injuries. Plaintiff disregarded the School District's policy with

regard to the deposit of monies collected by her class and the keeping of students in her classroom during "home school" time. Plaintiff's mishandling of the March 11, 1986 incident and her failure to report accurately and timely the details of that incident were the final straws which broke the administration's patience with plaintiff.

Moreover, Andersen testified during trial that he evaluated plaintiff with respect to herself and not in relation to other teachers and that he gave plaintiff "generously good" evaluations in order to motivate plaintiff to improve her teaching skills. The court finds Andersen's statement to be persuasive. Consequently, Andersen's evaluations must be weighed in the context of all evidence presented to the Board and Andersen's own objectives in evaluating plaintiff. The court finds the evaluations do not establish the Board's findings were pretextual.

Plaintiff asserts the Board's findings were a pretext to hide the School District's unwillingness to stand up to white parents and students who were hostile toward plaintiff because of her race and wanted her discharged. There is no evidence in the record that the School District capitulated to any racial pressures exerted by white students or parents. During the meeting between the group of parents led by Barbara Challies and Fauntleroy, there is no credible evidence that the parents expressed a racial animus towards plaintiff.

Further, Andersen took measures for the 1984–85 school year to remove any potentially hostile elements from plaintiff's classes. By assigning plaintiff first year cosmetology students, Andersen hoped that plaintiff could make a fresh start with new students and thereby rectify her problems with poor rapport.

Lastly, plaintiff emphasizes that Andersen's administrative transfer of her morning students to the Kent North School after the March 11, 1986 incident reflects a capitulation to parental racial intolerance.

**17.** Under the terms of the Incident Policy, a teacher engaging in such conduct is subject to immediate dismissal.

First, plaintiff has produced no evidence that any parents seeking the removal of their students demonstrated a racial motivation to the administration. Second, the vast majority of plaintiff's morning students were transferred to the Kent North School only after parents threatened to remove their children from plaintiff's class. The transfer was effectuated so that students would not lose their credits as would have occurred if they simply were withdrawn. The court views Andersen's conduct as being a preferable solution undertaken in the interests of the students rather than as capitulation to racial pressure.

Finally, plaintiff claims that the School District failed to provide her with the administrative support and student disciplinary reenforcement afforded to white teachers, and as a result, her teaching efficiency was compromised. However, plaintiff has not established by a preponderance of the evidence that the administration of the Kent South School imposed a lesser degree of discipline on plaintiff's students than students of white teachers for comparable misbehavior. Rather, the record reveals that plaintiff had difficulties in following established disciplinary procedures. For example, plaintiff failed to implement consistently her own discipline policy and frequently sent students to the principal's office for minor infractions. During Andersen's second year, three times as many students were sent to his office by plaintiff than were sent by any other instructor. Plaintiff repeatedly failed to adhere to Andersen's directives that she provide explanatory notes or phone calls when students were sent to his office, thereby thwarting Andersen's ability to ascertain the precise nature of the infraction and implement appropriate discipline. Moreover, Andersen testified that no other black teachers at the Kent South School had difficulties with student discipline. The court finds this uncontroverted testimony persuasive.

The court holds that plaintiff has failed to establish by a preponderance of the evidence that the School District's legitimate and nondiscriminatory reasons for her termination were pretextual and that plaintiff has failed to persuade the court by a preponderance of the evidence that the School District intentionally discriminated against plaintiff. An order will be entered granting judgment for the School District.