Abraham **WELDON**, Appellant,

v.

**KRAFT, INC.**

No. 89–1519.

United States Court of Appeals,
Third Circuit.

Argued Nov. 16, 1989.

Decided Feb. 22, 1990.

Richard J. Orloski (Argued), Orloski &
Hinga, Allentown, Pa., for appellant.

William F. Kershner (Argued), Pepper, Hamilton & Scheetz, Berwyn, Pa., for appellee.

Before HIGGINBOTHAM, Chief Judge * SCIRICA, Circuit Judge, and POLITAN, District Judge **

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This is an appeal from a grant of summary judgment in favor of defendant, Kraft, Inc. ("Kraft"). Plaintiff Abraham Weldon brought suit in district court against Kraft, his former employer, claiming that Kraft terminated his employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1982) ("Title VII"), as well as 42 U.S.C. § 1981 (1982) ("§ 1981").[1] Moreover, Weldon alleged violations of the Employee Retirement Income Security Act ("ERISA") and Pennsylvania's Wage Payment and Collection Law ("WPCL"). We will affirm the dismissal of the ERISA and WPCL claims but because we find that the evidence creates a genuine issue of material fact as to whether Kraft intentionally discriminated against Weldon, we will reverse the dismissal of Weldon's discrimination claims.

### I.

Weldon, a black male, was employed as an assistant supervisor in Kraft's Lehigh Valley, Pennsylvania plant from June 1986 until he was fired, effective April 14, 1987. Kraft claims that it terminated Weldon because: 1) his job performance was unsatisfactory; 2) he failed to produce adequate medical documentation for a month-long absence; and 3) he failed to follow company policy requiring the return of unused advance money within seven days of the completion of a business trip. Weldon contends that the asserted reasons are pretextual and that his termination was racially

motivated. The depositions and documents included in the record set forth the following information.

Kraft recruited Weldon through an employment agency specializing in minority applicants. Prior to his hiring, Weldon visited the plant and was interviewed by several Kraft managers and supervisors. It was standard practice at Kraft to check references and contact the applicant's former employers. Satisfied that Weldon was the best candidate of those interviewed, Kraft hired him on June 30, 1986.

From June 1986 through February 1987, Weldon was assigned to the first shift in the salads department under John Gier, an experienced supervisor with a reputation as one of Kraft's most demanding trainers. In a December 1986 written evaluation, Gier rated Weldon's performance as "below expectations." The report indicated that Weldon had failed to meet a number of his performance objectives and that productivity had decreased in the department by ten percent. According to Gier,

> Apparent lack of sense of priorities deters performance enhancement. Desire to increase knowledge of company policies and procedures seems questionable. Manager needs to affirm a concerted effort (presently insufficient) to broaden the overall skills and knowledge required to be a good Kraft manager. Improvement in employee relations remains a priority

In addition, Gier reportedly wrote a letter to his direct supervisor, in which he stated that Weldon lacked the intelligence necessary for the position. Later, as part of his deposition testimony, however, Gier stated that Weldon was both intelligent and capable but lacked motivation.

Weldon contends that Gier treated blacks unfairly. He claims that Don Griffin, a black trainee under Gier, was forced to seek the help of another supervisor to learn

---

* The Honorable A. Leon Higginbotham, Jr. became Chief Judge on January 16, 1990.

** The Honorable Nicholas H. Politan, United States District Judge for the District of New Jersey, sitting by designation.

1. Weldon's complaint also contained a Fourteenth Amendment claim against Kraft. The district court held that Weldon could not proceed on that claim because Kraft is a private corporation and Weldon made no showing of state action.

the technical aspects of the job, and that another black trainee transferred out of Gier's department to avoid losing his job. Weldon also claims that several black coworkers reported to him their personal experiences or the experiences of other blacks who had received poor evaluations from Gier or who had personal confrontations with him. According to Weldon, Richard Cliffe, a personnel manager, admitted that Gier had difficulty working with minority employees. In addition, Weldon claims that white coworkers warned him that Gier would disapprove if Weldon became too friendly with them. He concluded, however, that Gier's disapproval was unrelated to the fact that Weldon was black. Finally, Weldon claims that Cliffe had promised to assign him to Carlos Delgado, whom Weldon alleges is a "minority trainer."

Gier confirmed that several black trainees under his supervision had experienced difficulties mastering job skills but contends that there was no personal animosity between himself and his trainees. Gier claims to have been instrumental in the promotion of the black trainee who allegedly transferred to save his job.

Richard Cliffe denies telling Weldon that Gier had problems with minority employees. He claims to have been present when Don Griffin and Weldon discussed their problems working with Gier. Cliffe states that Griffin indicated that his difficulties were job-related and that he considered Gier to be an extremely demanding trainer. According to Cliffe, Griffin did not represent that Gier had any particular difficulty with black trainees. The record contains no deposition of Griffin and the parties cite to none. Finally, Cliffe states that he never promised to assign Weldon to Delgado and that Kraft has not designated any supervisor as a "minority trainer."

In February 1987, Cliffe arranged to have Weldon transferred to the third shift in the portion control department under the supervision of Ellen Williams. According to Cliffe, the transfer was arranged to "give [Weldon] a fresh start under another supervisor" and to ensure that Weldon's performance problems were not related to the conflict with Gier.

Williams claims that she was not satisfied with Weldon's performance. She contends that Weldon had difficulty mastering and completing the various reports for which he was responsible, that he lacked initiative, and that he avoided active involvement in the day-to-day operations of the department. According to Williams, because of these perceived deficiencies, she and Jerry Serfass, the third shift superintendent, developed an "action plan" for Weldon that indicated areas for development and listed reports that Weldon should complete on a regular basis. Serfass claims to have met with Weldon on several occasions to discuss the plan, but contends that Weldon never forwarded any of the requested reports. Williams also claims to have met with Weldon numerous times to explain the plan and to monitor his progress. She contends that she never observed Weldon working on the reports.

Weldon notes that he was the first trainee to be placed under William's supervision and that Williams had very little contact with blacks prior to the assignment. Moreover, Weldon challenges William's claim that she worked with him on improving the areas identified in the "action plan." The plan was contained in a memo from Serfass dated March 23, 1987. Williams testified at her deposition that she met and worked with Weldon after she received the memo. However, Weldon did not return to work on a regular basis after March 19, 1987.

As part of his training, Weldon was scheduled to attend a week-long seminar conducted by Kraft beginning on Sunday, March 23, 1987, in Chicago, Illinois. The company had provided Weldon with airplane tickets and a $1000 cash advance to cover expenses. Weldon asked to be excused from work on the preceding Friday to prepare for the trip. Williams denied the request, claiming she needed his assistance in performing the sanitation tasks generally conducted on Friday nights.

Nonetheless, on Friday, March 20, Weldon called Williams to inform her that he could not work that day because he was ill.

Weldon never attended the seminar and did not return to work until April 13, 1987. During his absence, Weldon spoke with Williams several times by telephone. They discussed making arrangements for the return of the cash advance and the airplane tickets. Moreover, Cliffe claims that Weldon received specific instructions to present medical documentation covering the duration of his absence upon his return.

Weldon returned to work on April 13 and, after his shift ended at 7:30 A.M. on April 14, he met with Serfass and Charles Harlin, the general superintendent. Weldon submitted a doctor's certificate covering three days of absence and the plane ticket. Although he did not return the $1000 advance as requested, he presented a $110 traveler's check and offered to sign over his last paycheck for $890, which had been withheld pending Weldon's return of the cash advance.[2] Harlin refused to accept the traveler's check, insisting that Weldon return the entire amount of the cash advance. He reminded Weldon of previous instances where Weldon had reimbursed cash advances with personal checks that were returned for insufficient funds. Moreover, he stated that he was disappointed with Weldon's job performance. At the conclusion of the meeting, Harlin suspended Weldon until further notice.

On April 16, Weldon again met with Serfass. He presented a doctor's certificate covering the period from March 20 to March 27. He signed over his withheld paycheck and again tendered the traveler's check, which this time was accepted. Nonetheless, on May 5, Cliffe issued a termination notice to Weldon, effective April 14, 1987. The letter stated that the termination resulted from Weldon's "ongoing performance deficiencies," and "lack of cooperation in resolving the question of [his] alleged disability." Moreover, it stated: "We still await requested documentation on your alleged disability which began on March 20, 1987 so we can resolve the mat-

ter of your Short Term Disability benefits. Please be reminded that this is the fourth request for this ... information." On May 7, Weldon produced a medical certificate covering the entire period of his absence.

Weldon claims that Kraft's insistence on medical certification evidenced racial animus because as a general rule Kraft required medical certification only from those with a history of abusing sick leave. Weldon did not have such a history and he contends that a similarly situated white employee would not have been treated as he was. Moreover, he claims that Kraft would not have withheld the paycheck of a white employee under the circumstances and that he was forced to use the cash advance until he was well enough to return to work.

Finally, Weldon contends that his statistical evidence indicates that minorities constitute 37.9%, "a disproportionate amount," of the involuntary terminations at Kraft between 1985 and 1988. According to Weldon, this suggests that Kraft has a "revolving door" policy for minority employees. Kraft counters that Weldon improperly grouped together all minorities in reaching its conclusion and that only 9.6% of the involuntary terminations within that period were black employees, while blacks comprised 14% of the employees in Weldon's job group.

## II.

To prevail on a claim of disparate treatment under Title VII or § 1981, the plaintiff must demonstrate purposeful discrimination. *See Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989). Absent direct evidence, the plaintiff may prove intent through the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[3]

---

**2.** There is some discrepancy in the record over whether the $110 check presented by Weldon was a traveler's check, a certified check, or a

money order. The parties appear to agree, however, that it was not a personal check.

**3.** Faced only with the question of whether Weldon's offer of proof on the issue of intentional

*See Patterson,* 109 S.Ct. at 2377–78; *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985). Under this framework, the plaintiff has the initial burden of proving a *prima facie* case by a preponderance of the evidence, which if successful, raises the inference of unlawful discrimination. *Burdine,* 450 U.S. at 250–52, 101 S.Ct. at 1092–93. This burden is not onerous. The plaintiff must show that he is a member of a racial minority, qualified for the job from which he was discharged, and that others not in the protected class were treated more favorably. *See Hankins v. Temple University,* 829 F.2d 437, 440 (3d Cir.1987).

If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to clearly set forth a legitimate, nondiscriminatory reason for the discharge. *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094. A satisfactory explanation dispels the inference of discrimination arising from the plaintiff's initial evidence. *Id.* The ultimate burden of persuasion remains with the plaintiff, who then must prove by a preponderance of the evidence that the reasons asserted by the defendant were a pretext for discrimination. *Id.* at 253, 101 S.Ct. at 1093. This may be accomplished either directly, by showing that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the asserted reason is unworthy of credence. *Id.* at 256, 101 S.Ct. at 1095. The plaintiff's initial evidence may be considered by the trier of fact in making this determination. *Id.* at 255 n. 10, 101 S.Ct. at 1095 n. 10.

A plaintiff need not carry this burden, however, to withstand a motion for summary judgment. Furthermore, the evidence must be viewed in the light most favorable to the nonmoving party. *Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200, 204 (3d Cir.1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988). A trial court may enter summary judgment only "if the pleadings, deposi-

tions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if there is sufficient evidence upon which a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The role of the trial judge "is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* at 250, 106 S.Ct. at 2511. Our review of the district court's decision is plenary. We must apply the same test the court should have used initially. *Hankins,* 829 F.2d at 440.

In a discrimination case, we must decide whether sufficient evidence exists to create a genuine issue as to whether the employer intentionally discriminated. *Id.* The defendants must show that "the plaintiff will be unable to introduce either direct evidence of a purpose to discriminate or indirect evidence by showing that the proffered reason is subject to factual dispute." *Id.* at 440–41. A plaintiff who has made a *prima facie* showing of discrimination can withstand a summary judgment motion by pointing to "evidence establishing a reasonable inference that the employer's proffered explanation is unworthy of credence." *Sorba,* 821 F.2d at 205.

In this case, the district court concluded that Weldon had established a *prima facie* case of discrimination. Although Kraft apparently conceded that Weldon was discharged while similarly situated white coworkers were retained, Kraft argued that Weldon was not qualified for his position as evidenced by his poor performance evaluations. Nonetheless, the court accepted, *arguendo,* that Weldon's recruitment and employment by Kraft established his qualifications for purposes of the *prima facie* case.

discrimination is sufficient to withstand summary judgment, we need not decide whether Weldon has stated a claim cognizable under

§ 1981, as explained by the Supreme Court in *Patterson v. McLean Credit Union,* —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

The district court also held that Weldon had failed to discredit Kraft's assertion that poor job performance and failure to provide adequate medical documentation were legitimate, nondiscriminatory reasons for his termination. According to the court, the only evidence Weldon presented to defeat the assertion of poor performance was his own unsupported testimony that in his view, he performed satisfactorily. The court held that Weldon "cannot rebut defendant's position solely by reference to his own self-interested assertions." Similarly, with respect to the lack of medical documentation, the court stated that Weldon's only rebuttal evidence was his own assertion that similarly situated whites would not have been required to provide such documentation. The court found that there was nothing in the record to show that Kraft would not have required the same from whites and that Weldon's failure to provide the documentation after repeated requests was a legitimate reason for his termination.

Because the court found that Weldon had not met his burden of showing that Kraft's assertions concerning job performance and failure to provide medical certification were unworthy of credence, the court did not discuss in detail Kraft's third asserted reason for the discharge, Weldon's failure to follow company policy with respect to advance money. The court stated, however, that in light of Weldon's offer and actual return of the full amount of the advance, it could not "conclude as a matter of law that his delay in reimbursing Kraft, standing alone, would constitute a sufficient reason for his discharge."

In response to Weldon's statistical data, the district court noted that statistics highlighting an employment practice with a disproportionately adverse effect on minorities may be probative of an intent to discriminate. Nonetheless, the court found that a 9.6% termination rate for black employees was insufficient to show that Kraft maintained a "revolving door" policy.

### III.

To establish a *prima facie* case, Weldon must show that he was qualified for his position. On appeal, Kraft argues that Weldon's poor performance evaluations indicate that he was not qualified. Under the circumstances, we believe that Weldon has established a *prima facie* case.

The framework set forth in *McDonnell Douglas*, which begins with proof of a *prima facie* case, was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The importance of the framework lies in "its recognition of the general principal that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on discriminatory criterion illegal under the Act." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977); *see E.E.O.C. v. Metal Service Co.*, 892 F.2d 341, 348 (3d Cir.1990) (courts should be sensitive to myriad of ways such an inference can be created).

Kraft's claim that Weldon cannot establish a *prima facie* case is intertwined with its assertion that Weldon's poor performance evaluations constitute a legitimate reason for the discharge. We have held that while objective job qualifications should be considered in evaluating the plaintiff's *prima facie* case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to the later stage of the *McDonnell Douglas* analysis. We noted that subjective evaluations "are more susceptible of abuse and more likely to mask pretext." *Fowle v. C & C Cola*, 868 F.2d 59, 64–65 (3d Cir.1989). Thus, to deny the plaintiff an opportunity to move beyond the initial stage of establishing a *prima facie* case because he has failed to introduce evidence showing he possesses certain subjective qualities would improperly prevent the court from examining the criteria

to determine whether their use was mere pretext. *Id.* at 65.

In this case, Kraft does not contend that Weldon lacked the background qualifications for the position at the time he was hired. Moreover, Gier testified that Weldon had both the intelligence and the ability required for the position but lacked motivation. The negative evaluations Weldon received from Gier and Williams are couched largely in subjective terms. Gier found that Weldon lacked "a sense of priorities," the "[d]esire to increase knowledge of company policies and procedures," and that he failed to put forth a "concerted effort" to broaden his skills. Williams indicated that Weldon had difficulty understanding and preparing the reports that were required of him, that he lacked initiative, and that he avoided active involvement in the day-to-day operations of the department. On the other hand, Gier's evaluation that Weldon failed to meet performance goals in the areas of productivity, output, and efficiency is based on objective criteria. In this instance, however, it is unclear whether the goals constituted a standard of performance expected of all assistant supervisors or instead represented a subjective determination by Gier of the performance level Weldon had to achieve to be deemed a satisfactory assistant supervisor in that department. Indeed, there is no dispute that Gier was one of the most demanding supervisors at Kraft.

We certainly do not question Kraft's prerogative to set any standards it wishes for employee performance nor do we seek to substitute our view of what constitutes adequate performance. We simply decline to treat these subjective assessments as evidence that Weldon has failed to establish a *prima facie* case, thereby collapsing the entire analysis into a single initial step at which all issues are resolved. *See Fowle*, 868 F.2d at 64. Rather, we will consider the assessments in the context of Weldon's charge that the poor evaluations he received were a pretext for racial discrimination and unworthy of credence.

## IV.

Weldon contends that Kraft's asserted nondiscriminatory reasons are pretextual and that his termination was racially motivated. According to Weldon, his assignment to one of the toughest supervisors at Kraft, who allegedly had a history of difficulties with black trainees, and then to a supervisor who lacked experience both as a trainer and in dealing with black employees raises an inference that Kraft neither intended nor expected him to succeed in his position. Weldon contends that his discussions with and about other black employees show that his experience as a black trainee was not unique. Moreover, he argues that the statistical evidence regarding the involuntary termination of minority employees at Kraft supports an inference that Kraft's asserted reasons are unworthy of credence. Finally, Weldon claims that Kraft would not have required medical documentation or strict adherence to the advance money policy from similarly situated white employees.

Although we consider this a close case, we conclude that Weldon's evidence is sufficient to create a genuine issue of fact and that the district court erred in granting summary judgment. If a factfinder were to credit Weldon's testimony regarding the harshness of the treatment he and other blacks received as well as his view of the statistical evidence, it could conclude that the performance evaluations were unfair and that Kraft's explanations were pretextual. Rather than determining whether the evidence could support an inference of pretext, however, we believe the district court weighed the competing testimony and resolved factual issues that should have been left for another day.

For example, the district court balanced Weldon's testimony that certain black employees had been the target of Gier's racism, against the contrary testimony of Gier and Cliffe, and concluded that "the record establishes that Gier ... did not have specific problems with black employees." Although Weldon was extraordinarily tardy in providing his supervisors with complete medical documentation, he did present cer-

tificates covering approximately one-third of his absence prior to his termination. In view of this, the district court decided that Weldon's proof had "not overcome defendant's assertion that his failure to provide medical documentation ... was a legitimate, nondiscriminatory reason for his termination."

We recognize that the district court, sitting as a trier of fact, ultimately may decide that Weldon failed to meet his burden of showing by a preponderance of the evidence that Kraft's explanations were pretextual. At this stage, however, the only question before the district court was whether the evidence established a reasonable inference that Kraft did not discharge Weldon for the reasons asserted. *See Sorba*, 821 F.2d at 205.

■ We cannot agree that Weldon's uncorroborated deposition testimony is insufficient to create a genuine issue on the question of discriminatory intent. As we have stated in the past, there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion. *Jackson v. University of Pittsburgh*, 826 F.2d 230, 236 (3d Cir.1987), *cert. denied*, 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988); *see Graham v. F.B. Leopold Co., Inc.*, 779 F.2d 170, 173 (3d Cir.1985) (plaintiff's deposition testimony could suffice to create genuine dispute about material issue). Discriminatory conduct is often subtle and difficult to prove. For this reason, our legal system permits discrimination plaintiffs to prove their cases with circumstantial evidence. *Jackson*, 826 F.2d at 236. This record contains circumstantial evidence from which a reasonable trier of fact could find that Kraft's claims are pretextual and that racial animus played a role in Weldon's discharge. The issue of pretext in this case turns largely on the credibility of the competing testimony. As such, it is inappropriate to decide on a motion for summary judgment. *Id.*[4]

### V.

The district court dismissed Weldon's ERISA claim after finding that Weldon had failed to exhaust his administrative remedies. Except in limited circumstances that are not alleged here, a federal court will not entertain an ERISA claim unless the plaintiff has exhausted the remedies available under the plan. *Wolf v. National Shopmen Pension Fund*, 728 F.2d 182, 185 (3d Cir.1984).

■ Under the Kraft plan, a claimant may appeal an adverse determination to the plan administrator within ninety days of receiving notice of denial of benefits. It is undisputed that Weldon failed to appeal the denial of his claim to the administrator. He argues, however, that he should be deemed to have exhausted his administrative remedies because his attorney was in contact with Kraft's in-house counsel regarding the claim. As the district court correctly noted, however, Weldon has not provided us with any information regarding the substance of those contacts. On the undisputed facts before us, we must conclude that Weldon has failed to present any evidence that he has exhausted his administrative remedies and thus Kraft is entitled to summary judgment on this issue.

■ The district court also dismissed Weldon's claim under WPCL, Pa.Stat.Ann. tit. 43, § 260.1 *et seq.* (Purdon 1964 & Supp. 1989). Weldon does not contest the district court ruling that ERISA preempts WPCL with respect to his disability benefits claim. He contends, however, that a genuine factual dispute exists with respect to his claim for wages lost during his suspension.

WPCL provides in part:

Whenever an employer separates an employe from the payroll, or whenever an employee quits or resigns his employment, the wages or compensation earned

---

**4.** In light of our decision that Weldon's evidence is sufficient to withstand summary judgment under the *McDonnell Douglas* framework, we need not decide whether the evidence is suffi-

cient to withstand a similar motion as a "mixed motive" case under the framework established in *Price Waterhouse v. Hopkins*, —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

 

shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable.

Pa.Stat.Ann. tit. 43, § 260.5 (Purdon Supp. 1989). WPCL does not create a right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract between the parties governs in determining whether specific wages are earned. *Sendi v. NCR Comten, Inc.*, 619 F.Supp. 1577, 1579 (E.D.Pa.1985), *aff'd*, 800 F.2d 1138 (3d Cir.1986); *Laborers Combined Funds v. Mattei*, 359 Pa.Super. 399, 403, 518 A.2d 1296, 1298 (1986).

■ Kraft contends that it is company policy not to pay wages during suspension and that only employees who are reinstated become eligible for back pay. Moreover, Kraft states that Weldon performed no services for the company during his suspension that would entitle him to wages. Weldon claims that as a salaried employee, he was eligible to receive wages during his suspension. In support of his position, Weldon cites a statement by Richard Cliffe indicating that Cliffe could not recall a specific case involving the suspension without pay of a white salaried employee. Cliffe explained, however, that he had no specific recollection "[b]ecause terminating a management employee is ... a rare case.... But the same procedure would have been utilized."

There is no evidence to indicate that Kraft had an express contractual obligation to pay wages to a salaried employee during a suspension that ultimately resulted in termination. Nor do we believe that a reasonable trier of fact could infer from Cliffe's statement the existence of an implied contractual obligation. Therefore, we find that Kraft is entitled to summary judgment on this issue.

## VI.

For the foregoing reasons, we will affirm the dismissal of Weldon's claims under ERISA and WPCL. Because we find that the evidence creates a genuine issue as to whether Weldon's termination was racially motivated, we will reverse the dismissal of the discrimination claims and remand to the district court.

Each side to bear its own costs.