Robert H. COHEN, Plaintiff,

v.

Richard G. AUSTIN, Administrator,
General Services Administration,
Defendant.

No. 92–CV–5623.

United States District Court,
E.D. Pennsylvania.

Oct. 11, 1995.

Dennis L. Friedman, Dennis L. Friedman, P.C., Philadelphia, PA, for Plaintiff.

David R. Hoffman, Asst. U.S. Atty., U.S. Department of Justice, Philadelphia, PA, for Defendant.

### DECISION

JOYNER, Judge.

The plaintiff in this case is Robert H. Cohen, a 46–year old Jewish man who was denied a within-grade increase and eventually removed from his position as a GS–12 contract specialist with the General Services Administration ("GSA"). Mr. Cohen appealed to the Merit Systems Protection Board ("MSPB") and the Equal Employment Opportunity Commission ("EEOC"), both of which ruled in favor of the defendant. In September of 1992, Mr. Cohen filed a complaint in this Court, alleging that GSA denied him the within-grade increase and terminated him as a result of religious discrimination and reprisal, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.* Moreover, Mr. Cohen challenged the decision of the MSPB affirming the removal and denial of the within-grade increase.

After the parties compiled an extensive record, each submitted a motion for summary judgment. On August 25, 1994, we reversed the decision of the MSPB with respect to the removal and denial of the within-grade increase, but denied the motions with respect to the issues of religious discrimination and reprisal, allowing them to proceed to trial. *Cohen v. Austin,* 861 F.Supp. 340, *recons. denied,* 869 F.Supp. 320 (E.D.Pa. 1994). Accordingly, this matter was tried before this Court in a non-jury trial over the course of 15 days in late 1994 and early 1995, concluding on February 22, 1995. The parties have submitted their proposed findings of fact and conclusions of law and the matter is now ripe for decision. Accordingly, the Court makes the following factual findings and legal conclusions.

## FINDINGS OF FACT

1. On December 20, 1987, GSA hired Mr. Cohen as a GS–12 contract specialist. Mr. Cohen was assigned to GSA's Design and Construction Contracts Branch. Gov't Ex. 1.

2. Before he accepted the position at GSA, Mr. Cohen worked at the Defense Industrial Supply Center ("DISC"). One of his co-workers was Richard M. Newberg, who was a price analyst at DISC until he joined GSA as a contract specialist in November, 1986. Mr. Cohen and Mr. Newberg struck up a friendship. Tr., 2/15/95, pp. 78, 85.

3. In 1987, Mr. Newberg became aware of the availability of several contracting positions at GSA. Mr. Newberg contacted Mr. Cohen and informed him of the openings. When Mr. Cohen expressed an interest, Mr. Newberg recommended him for the job. Tr., 2/15/95, pp. 83–85.

4. Mr. Cohen's supervisor was Michael C. Greico, Jr., the Branch Chief. Tr., 11/29/94, p. 42.

5. Mr. Greico's direct supervisor was Bruce M. Zalut, a Jewish man who served as Director of the Contracts Division during the time period relevant to this lawsuit. Tr., 11/29/94, p. 42; 11/30/94, p. 28.

6. As a contract specialist, Mr. Cohen's responsibilities included: (1) negotiation on behalf of the government for the procurement of supplies, services and construction, (2) conducting cost and price analysis, and (3) the evaluation, award and administration of the contracts. Gov't Ex. 2.

7. During the initial months of Mr. Cohen's employment, Mr. Newberg served as Mr. Cohen's informal "coach." In this capacity, Mr. Newberg provided Mr. Cohen with samples of his work, as well as general guidance regarding the nuances of the contract specialist position. Tr., 2/15/95, p. 87.

8. Mr. Newberg's father was Jewish. Tr., 2/15/95, p. 187.

9. Within a few months after Mr. Cohen began working in the Design and Construction Branch, the relationship between Mr. Newberg and Mr. Cohen began to sour. Mr. Newberg perceived that Mr. Cohen was having difficulty grasping the requisites of his position. Moreover, Mr. Newberg began to hear complaints regarding Mr. Cohen's performance from others. Tr., 2/15/95, p. 89.

10. By April or May of 1988, Mr. Greico noticed that Mr. Cohen had failed to submit his work for review in a timely fashion, thereby delaying the awarding of contracts. Tr., 11/29/94, p. 58.

11. Mr. Newberg would berate Mr. Cohen in front of other personnel in the Design and Construction Branch, and would take a condescending and sarcastic tone with Mr. Cohen, talking to him as though he were a child. Tr., 12/5/94, pp. 6, 20, 23. In this respect, Mr. Newberg treated Mr. Cohen in a manner different from other contract specialists. Tr., 12/5/94, p. 20.

12. Mr. Newberg publicly told Mr. Cohen that he was dumb and stupid, and once commented that Mr. Cohen was the "dumbest Jew" he had ever seen. Further, Mr. Newberg made reference to Mr. Cohen's yarmulke, which he termed a "beanie." Tr., 12/5/94, pp. 49–50, 60. Finally, regarding an office party that Mr. Cohen did not attend, Mr. Newberg remarked that Mr. Cohen would have enjoyed the party because bagels and cream cheese were served. Tr., 11/30/94, p. 28.

13. In late April or early May of 1988, Mr. Newberg invited Mr. Cohen for a lunchtime walk to discuss Mr. Cohen's performance. Specifically, Mr. Newberg related his displeasure with Mr. Cohen's demonstrated inability to move a project through the system in a timely fashion. Moreover, Mr. Newberg expressed dissatisfaction with Mr. Cohen's failure to develop an understanding of the requisites of his position. Tr., 2/15/95, pp. 95–100.

14. In late May, 1988, Mr. Cohen complained to Mr. Greico regarding the manner in which Mr. Newberg had been treating him. Tr., 12/5/94, pp. 176–77.

15. Mr. Greico offered Mr. Cohen a position as a GS–11, with no decrease in salary. Mr. Greico perceived that Mr. Cohen was not performing at the GS–12 level. Mr. Cohen declined the offer, because of his feeling that his performance did not warrant a demotion. Tr., 11/29/94, pp. 68–70; 12/5/94, pp. 177–78.

16. In May or June, 1988, Mr. Greico began to monitor Mr. Cohen's performance directly. Mr. Greico served in this capacity until October, 1988. Tr., 12/1/94, p. 2.

17. During this time, Mr. Greico assigned Mr. Cohen to a number of projects. The Court finds that Mr. Cohen's performance was consistently unsatisfactory. For instance, regarding a contract for roofing repairs at a site in New Jersey, Mr. Cohen's missteps caused a lengthy delay in the awarding of the contract. Tr., 11/30/94, pp. 74–108.

18. Defendant presented other evidence of Mr. Cohen's failure to perform at the required level. *See, e.g.*, Tr., 11/30/94, pp. 113–15 (Mr. Cohen's error has the effect of eliminating potentially appropriate bidders from competing for a certain project); 2/15/95, pp. 95–100 (Mr. Cohen delays in awarding a contract to remedy a situation in which pieces of marble were falling from a West Virginia building, allowing a potentially unsafe condition to go unaddressed for an unreasonable period of time).

19. In the fall of 1988, the Design and Construction Branch was restructured. Contract specialists were assigned to one of three section chiefs. Mr. Cohen was assigned to a section headed by Mr. Newberg. Tr., 2/16/95, pp. 19–20.

20. On October 21, 1988, Mr. Greico issued a "Warning Regarding Unacceptable Performance" to Mr. Cohen. The memorandum (1) advised Mr. Cohen that his performance had been unacceptable; (2) set forth a performance improvement plan by which Mr. Cohen could raise his performance level to an acceptable rating; and (3) warned Mr. Cohen that a failure to improve his performance could result in the denial of a within-grade increase, demotion, or removal. Gov't Ex. 8.

21. Mr. Cohen failed to show sufficient improvement over the course of the succeeding weeks. As a result, on December 15, 1988, Messrs. Newberg and Greico notified Mr. Cohen, by memorandum, that he would not receive a within-grade increase. The memorandum noted that Mr. Cohen had failed to demonstrate "sufficient improvement to be evaluated at least marginally successful at the GS12 level." Gov't Ex. 10. Mr. Zalut approved this action on February 7, 1989.

22. On December 29, 1988, Mr. Cohen submitted a letter of protest to Mr. Zalut. Mr. Cohen argued that the denial of the within-grade increase was the result of a "personal vendetta" Mr. Newberg harbored against him. The letter made no mention of religious discrimination. Gov't Ex. 113.

23. Mr. Cohen received an unacceptable performance rating for the period between March 1, 1988 and February 28, 1989. Gov't Ex. 11.

24. In February of 1989, Mr. Cohen filed an appeal of the denial of the within-grade increase with the MSPB, where he raised the issue of religious discrimination for the first time. A hearing was held over nine days between May 15 and June 15, 1989. Thus, between February and June, Mr. Cohen was absent from work for over twenty days preparing and presenting his appeal. Tr., 12/6/94, p. 39.

25. On May 19, 1989, Mr. Greico notified Mr. Cohen, by memorandum, that he was proposing Mr. Cohen's removal. In the memorandum, Mr. Greico noted that Mr. Cohen's performance had not reached an acceptable level, even after he had been warned that his continued failure to meet the position's requirements could result in his removal. Gov't Ex. 12.

26. Mr. Zalut concurred with Mr. Greico's recommendation. As a result, on June 30, 1989, Mr. Zalut removed Mr. Cohen from his position as a GS–12 contract specialist due to Mr. Cohen's unsatisfactory performance. Gov't Ex. 18.

27. Mr. Cohen presented a wealth of evidence at trial to show that he was treated differently from other contract specialists at GSA. For example, Mr. Cohen proved that he was subjected to Mr. Newberg's public criticisms, while others were not. Tr., 12/5/94, p. 20. Further, Mr. Cohen demonstrated that other contract specialists failed to meet the performance standards to which Mr. Cohen was held, but did not suffer the sort of consequences incurred by the plain-

tiff. *See, e.g.,* Tr., 12/6/94, pp. 118–20, 125–29.

28. Mr. Cohen conceded at trial, however, that Mr. Zalut did not deny him his within-grade increase and eventually remove him from his position on account of religious discrimination. From Mr. Cohen's testimony:

Q. Do you believe that Mr. Zalut denied you your within grade increase and ultimately removed you because you were Jewish?

A. I don't believe Mr. Zalut is antisemitic.

Q. That's not my question. Do you believe he took this personnel action as the deciding official based upon your religion?

A. I don't think he made his decision predicated on that.

Q. In fact, you heard him testify that it pained him to have to remove you because you were a Launsman, a fellow Jew, you heard that testimony?

\* \* \* \* \* \*

A. I remember him saying that in his testimony.

Tr., 2/14/95, pp. 108–09.

29. The Court finds, therefore, that Mr. Cohen has failed to demonstrate that he was treated differently on account of his religious affiliation.

30. The Court likewise finds that Mr. Cohen was terminated from his position as a result of his unacceptable performance level, and not because of either his religious affiliation or in retaliation for filing an appeal of the denial of the within-grade increase with the MSPB.

## DISCUSSION

### I. DISPARATE TREATMENT CLAIM

■ As we noted above, Mr. Cohen has alleged that he was denied a within-grade increase on account of his religious affiliation, and later removed from his position on the basis of both religious discrimination and reprisal, in violation of Title VII of the Civil Rights Act of 1964. Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 2000e–2(a)(1) (1994). A Title VII plaintiff can proceed under two separate theories in his attempt to demonstrate an entitlement to relief. The first, disparate impact theory, arises when an employer implements a facially neutral employment practice which creates a substantial adverse impact on a protected group, and which does not advance some legitimate business goal of the employer. *E.E.O.C. v. Metal Service Co.,* 892 F.2d 341, 346 (3d Cir.1990) (citing *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)).

■ The second available path for a plaintiff, and the theory under which Mr. Cohen proceeds, is disparate treatment theory. A disparate treatment claim "is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII." *Id.* at 347. Thus, Title VII does not mandate that all similarly situated employees be treated in a like manner, but instead prohibits the employer from treating an employee differently on the basis of the employee's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Moreover, a plaintiff advancing a disparate treatment claim under Title VII must demonstrate purposeful discrimination. *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990). In the absence of direct evidence, discriminatory intent may be proved under the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ Thus, to make out a prima facie case, Mr. Cohen bears the burden of showing, by a preponderance of the evidence, that (1) he was a member of a protected class; (2) he was qualified for the job from which he was discharged; and (3) others not in the protected class were retained. *Weldon,* 896 F.2d at 797; *Blanding v. Pennsylvania State Police,* 811 F.Supp. 1084, 1093 (E.D.Pa.1992) (citing *McDonnell Douglas,* 411 U.S. at 802,

93 S.Ct. at 1824), *aff'd,* 12 F.3d 1303 (3d Cir.1993). Should the plaintiff succeed in making out a prima facie case, an inference of discrimination is created, and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory rationale for its employment action. *Weldon,* 896 F.2d at 797; *Smith v. Chevron USA, Inc.,* 876 F.Supp. 70, 75 (E.D.Pa.1995). Once the defendant makes this showing, the presumption of discrimination evaporates and the onus is again on the plaintiff to prove by a preponderance of the evidence that the defendant's stated reason is a pretext for discrimination; that is, the plaintiff must show that (1) the reason provided by the employer was false and (2) that discrimination was the real reason for the adverse employment action. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993).

■■■■ Turning to the instant matter, we first conclude that Mr. Cohen has successfully made out a prima facie case of discrimination. In so finding, we note that Mr. Cohen's burden in this regard "is not onerous." *Weldon,* 896 F.2d at 797. Moreover, we are mindful of the Third Circuit's admonition that the "prima facie test should not be viewed as a rigid formula" which requires a plaintiff to satisfy each element. *Metal Service,* 892 F.2d at 347. Instead, a plaintiff can make out a prima facie case by " 'offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.' " *Id.* at 348 (quoting *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)). Here, Mr. Cohen has successfully raised such an inference. First, Mr. Cohen is a member of a protected class. Further, the evidence shows that his superiors were aware of his religious affiliation, treated him in a manner different from other contract specialists, and eventually terminated his employment. These facts are sufficient to raise an inference of discrimination.

■■■■ Defendant contends that Mr. Cohen was denied the within-grade increase and eventually terminated because of his inability to perform competently at the GS–12 level. In support of this argument, Defendant presented evidence of numerous instances in which tasks went unaccomplished as a result of Mr. Cohen's ineptitude. *See* Findings of Fact Nos. 17–18. Since the explanation offered by Defendant is legitimate and non-discriminatory, the burden rests with Mr. Cohen to demonstrate that Defendant took the adverse actions on account of some discriminatory animus. As we noted above, Mr. Cohen attempts to make this showing under disparate treatment theory. But while he was able to show that he was treated differently as compared to other contract specialists, Mr. Cohen has failed to convince the Court that he was treated differently on account of his religious affiliation.

Our conclusion is supported by the facts elicited at trial. First, we note that the evidence that could be construed as relating to Mr. Cohen's religion does not compel the conclusion that Mr. Cohen seeks to establish. This evidence consists of Mr. Newberg's reference to Mr. Cohen's "beanie," the remark that Mr. Cohen was the "dumbest Jew" he had ever seen, and the remark regarding bagels and cream cheese. *See* Finding of Fact No. 12. Since the two men enjoyed a friendship before Mr. Cohen was hired by GSA however, and since it was Mr. Newberg who was largely responsible for Mr. Cohen's hiring, we conclude that the remarks, at the very worst, merely reflect a certain insensitivity on Mr. Newberg's part. They fall far short of proving, however, that Mr. Newberg harbored some discriminatory bias against Jews. Mr. Cohen asks us to believe that Mr. Newberg befriended him and recommended him for the job at GSA, and that once he was hired, initiated a campaign to achieve his removal, all because Mr. Newberg, whose father was Jewish, held a prejudice against Jews. A much more plausible explanation for the deterioration of the relationship between Mr. Cohen and Mr. Newberg, and the resulting difference in the treatment accorded Mr. Cohen vis a vis other contract specialists, is that they were the result of Mr. Newberg's response to Mr. Cohen's inability to perform at the expected level.

Second, we note that Mr. Zalut is himself Jewish. Indeed, Mr. Zalut testified that he

was subjected to religious discrimination as a young man, and that he takes an extremely aggressive posture in his current role when confronted with instances of discrimination. Tr., 11/30/94, p. 29. Mr. Cohen's allegations ignore that it was Mr. Zalut who approved both the denial of the within-grade increase and the removal of Mr. Cohen from his position. And as Mr. Cohen himself conceded at trial, Mr. Zalut's actions were not animated by a discriminatory bias. Finding of Fact No. 28. Given these circumstances, we find Mr. Cohen's assertion that the actions taken against him were motivated by discrimination to be utterly without merit. Thus, because Mr. Cohen has failed to convince us that the rationale provided by Defendant is unworthy of credence, or that unlawful discrimination lies at the heart of GSA's personnel actions, we must award judgment to Defendant with respect to Mr. Cohen's disparate treatment claim.

## II. *RETALIATION CLAIM*

Mr. Cohen also argues that he was discharged unlawfully in retaliation for advancing allegations of religious discrimination. In order for Mr. Cohen to prevail with respect to his retaliation claim, he must show that (1) he was engaged in a protected activity, (2) he was discharged after or contemporaneous with the activity, and (3) a causal link existed between the protected activity and the discharge. *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 501 (3d Cir.), *cert. denied,* 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991). Upon review of the evidence supporting this claim, however, we conclude that Mr. Cohen has failed to establish a nexus between his allegation of religious discrimination and his removal. The extent of Mr. Cohen's presentation on this issue consists of evidence suggesting that his superiors had knowledge of the nature of his allegations prior to removing him. Given our finding that Mr. Cohen was discharged on account of his substandard work performance, however, we find the reprisal claim to be unsupported by the record.

The evidence presented compels the conclusion that Mr. Cohen's superiors were dissatisfied with his performance well before he raised claims of religious discrimination in early 1989. Indeed, as early as the spring of 1988, Mr. Cohen was put on notice with respect to his inability to perform at the required level. Finding of Fact No. 13. Later, in October of that year, Mr. Cohen received a memorandum warning him that removal could result from his continued unsatisfactory performance. Finding of Fact No. 20. Finally, in December, Mr. Cohen was denied a within-grade increase due to his substandard performance. Finding of Fact No. 21. Thus, the conclusion Mr. Cohen would have us reach—that he was removed from his position in retaliation for raising the discrimination issue, and not on account of some performance deficiency—is plainly illogical in light of the record. Mr. Cohen was removed because of his inability to meet the position's requirements. Accordingly, judgment will be entered in Defendant's favor with respect to Mr. Cohen's retaliation claim.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter by virtue of 28 U.S.C. § 1331 and 42 U.S.C. § 2000e–2(a).

2. Plaintiff has failed to prove by a preponderance of the evidence that he was denied a within-grade increase and removed as a result of religious discrimination.

3. Plaintiff has failed to prove by a preponderance of the evidence that he was removed in retaliation for asserting claims of religious discrimination.

4. Judgement is entered in favor of Defendant with respect to the Title VII claims contained in Plaintiff's Complaint.