

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-30-2005

# Sheils v. Pfizer Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3724

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Sheils v. Pfizer Inc" (2005). *2005 Decisions*. Paper 500.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/500

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 04-3724
_____

JAMES J. SHEILS
                                                            Appellant

v.

PFIZER, INC.

_____

On Appeal from the United States District Court
For the Western District of Pennsylvania
(Case No. 02-CV-01913)
District Judge: Honorable Donetta W. Ambrose

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 27, 2005
_____

Before: RENDELL, FUENTES, and GARTH, Circuit Judges

(Opinion Filed: September 30, 2005)
_____

OPINION
_____

Garth, Circuit Judge:

James J. Sheils ("Sheils") appeals the order of the United States District Court for the Western District of Pennsylvania granting a motion for summary judgment filed by Pfizer, Inc. ("Pfizer"). For the reasons that follow, we will affirm.

I.

The facts, viewed as they must be in the light most favorable to Sheils, are as follows:

Sheils worked as a field sales representative at Pfizer.[1] As part of the compensation package Sheils was given when he became a Pfizer employee in 1997, he received an option to purchase shares of the company's common stock. Pfizer granted Sheils an option to purchase additional shares the next year.

The agreements that governed both of these options (the "stock option agreements") contained explicit manner and time requirements for the exercise of the options. Specifically, they required that all employees exercise their options "by the giving of written notice of exercise to" Pfizer, and that a terminated employee exercise his options "within three (3) months after the date on which [his] employment . . . terminates." The stock option agreements also made clear that options could not be

---

[1] Sheils began working in 1997 for Agouron Pharmaceuticals, which merged with Warner-Lambert in 1999. Pfizer later purchased Warner-Lambert. Neither of the parties alleges that these changes in the identity of Sheils's employer affect the issues raised in this lawsuit. For ease of reference, then, we will refer to the company that employed Sheils at all times relevant to the lawsuit as "Pfizer."

1

exercised after they had expired. (A139, A140, A169, A170).

Sheils read and understood the stock option agreements. (A218-221). He had exercised options on a few occasions before this litigation commenced by submitting written notice to Pfizer, as those agreements required. (A208, A439, A447).

Though the stock option agreements provided that employees must exercise their options in writing, they did not provide more specifically how employees were supposed to do that (i.e., what information employees should include in the writing, to whom employees should give the writing, etc.). That specific information was conveyed elsewhere (although the record does not reveal where). What is clear from the record is that, up until July 1, 2002, employees exercised their options by giving a Notice of Exercise to the stock plan administrator, Cheryl Burr ("Burr"). (A71, A439).

This process for exercising options changed, however, on July 1, 2002. As of that date, employees had to open an account with Merrill Lynch and exercise their options through that institution instead of through Burr. (A106).

Sheils testified that he received a mailing from Pfizer in late April or early May of 2002 (A249-250) advising him as follows:

> Next week you will receive a Pfizer Stock Option Package in the mail. This kit will prepare you for the July 1, 2002 transition to the Merrill Lynch system. This kit will include important information about the new service, what you need to know to open an account and exercise your options and an invitation to the upcoming information sessions on May 13, 14 and 15th (arrangements are being made for those of you outside of the La Jolla area).

(A105). The kit referred to in this mailing ("the Kit") was sent to all past and current employees in May of 2002, but Sheils claims that he never received it, and thus never saw instructions for exercising his options under the new system. (A261).

Pfizer terminated Sheils on May 10, 2002. His stock options were fully vested on that day, and Sheils could have sold them for a net profit of $207,752.

At the time of his termination, Pfizer provided Sheils with separation documents that clearly reiterated that his stock options were subject to the terms and conditions of the stock option agreements. The separation documents also included a Merrill Lynch phone number that terminated employees could call if they had questions regarding their stock options. (A361). That phone number was the same one provided to Pfizer employees in the Kit. Sheils understood the separation documents (A203-204), and went back and reviewed the terms of the stock option agreements to which they pointed him. (A221).

Burr usually sent terminated employees a certified letter informing them of how many options they had, and reminding them how to go about exercising – and by when they needed to exercise – those options. (A72-73, A78-80). Sheils claims he never received such a certified letter from Burr.

Sheils called Burr on May 10, 2002 – the day he was terminated – seeking information about his stock options and how he could exercise them. (A204-205). Burr did not answer, so Sheils left a message; Burr never returned Sheils's call.

3

Sheils did not take further action regarding his stock options until June 13, 2002. On that day, Sheils called Merrill Lynch (using the number that was listed in his separation documents), and asked for information concerning his outstanding options. (A35, A206). The person to whom he spoke told him that Sheils did not have an account at Merrill Lynch, and so Merrill Lynch could not help him. (A269). In late June, Sheils called Burr again and left another message, which also went unreturned.

Sheils explains that he was not more proactive about seeking out someone at Pfizer or Merrill Lynch with whom to discuss his options because "everything having to do with [his] separation [from Pfizer] was extremely drawn out," and consequently he assumed the deadline for exercising the options would be extended until Burr got back to him with the information he requested. (A57-60). He also relied on language in the stock option agreements (section 5.07 of those documents) stating that the Pfizer Board of Directors or its delegates could extend that deadline, though there was no indication that Pfizer contemplated granting an extension for Sheils, or that Sheils requested one.

Burr left Pfizer shortly before the transition to the new system. Her last day at the company was June 30, 2002. On that day Burr sent an e-mail to all employees reminding them that she was leaving the company, and that from then on they should contact Merrill Lynch to exercise their stock options. (A75). Sheils claims he did not receive this e-mail.

On August 12, 2002, Sheils received a status report from Merrill Lynch that

4

informed him that his stock options had expired on August 11, 2002. (A174). He immediately called the number on the report and left a message (as opposed to speaking to someone live) because it was already after business hours.

The next day, he called Eileen Lacamera ("Lacamera") in the Stock Option and Incentive Plan office at Pfizer. Lacamera consulted with John Gates ("Gates") in Pfizer's Compensation and Benefits program. Gates and Lacamera confirmed that Sheils's options had expired and jointly made the decision not to reinstate the options. (A83).

II.

Sheils filed a complaint against Pfizer asserting a claim for breach of the stock option agreements and a claim under the Pennsylvania Wage Payment and Collection Law, 43 PA. CONS. STAT. ANN. §260.1 *et seq*. Pfizer moved for summary judgment. By Report and Recommendation dated July 27, 2004, Magistrate Judge Amy Reynolds Hay granted Pfizer's motion. On August 27, 2004, District Judge Donetta W. Ambrose adopted the Magistrate Judge's Report and Recommendation. This timely appeal from the District Court's final judgment followed.

III.

We exercise jurisdiction pursuant to 28 U.S.C. §1291. Our review of a grant of a summary judgment motion is plenary, and we apply the same standard as the District Court. Summary judgment is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, "there is no genuine issue as to any material fact and . . .

the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, however, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.*

A.

The Supreme Court of California has explained that an option has a dual nature: "from the viewpoint of the optionor, an option is a binding contract subject to the performance of a condition precedent by the optionee. From the viewpoint of the optionee, an option is an irrevocable offer which the optionee can convert into a binding bilateral contract by acceptance of the offer." *Palo Alto Town & Country Village v. BBTC Company*, 521 P.2d 1097, 1102 (Cal. 1974). Because the issue here focuses on the optionee's action (or, rather, failure to act), the Court must regard the option in question as an irrevocable offer. *Id.* The question, then, is whether Sheils accepted that offer, thereby forming a contract.

No reasonable jury could find that Sheils accepted the offer. "It is well settled that when the provisions of an option contract prescribe the particular *manner* in which the option is to be exercised, they must be strictly followed." *Id.* at 1098-99 (emphasis added). The limited period of time an option contract gives an optionee to exercise his

6

option, too, must be strictly enforced. *See* 15 Williston on Contracts §46:12 (4th ed.) ("an option by its very terms must be exercised within a specified time"). *See also Simons v. Young*, 93 Cal. App. 3d 170, 182 (1979) ("Since the optionor is bound while the optionee is free to accept or not as he chooses, courts are strict in holding an optionee to exact compliance with the terms of the option.").

Here, the stock option agreements explicitly required Sheils to exercise his option in writing, "within three months" of the day he was terminated. He failed to do this; his option thus lapsed. "[O]n the lapse of the option period, the matter is completely ended and the offer is withdrawn." *Allen v. Smith*, 94 Cal. App. 4th 1270, 1281 (2002).

## B.

Sheils argues that he did *not* fail to exercise his options within the prescribed period. The status report Sheils received on August 12, 2002 informed him his options had expired (or "terminated," in the language of the status report) on August 11, 2002. Because August 11 was a Sunday, Sheils's argues, he actually had until Monday, August 12, 2002 to exercise his options, under the California Civil Code ("the Code").

Section 11 of the Code provides that "[w]henever any act of a secular nature . . . is appointed by law or contract to be performed upon a particular day, which day falls upon a holiday, it may be performed upon the next business day, with the same effect as if it had been performed upon the day appointed." Section 7 of the Code defines "holiday" to include, among certain other days, "every Sunday."

7

Pfizer disagrees, arguing that if Sheils's options expired on August 11, he was obligated to exercise them by August 10, which is three months from the date of his termination, May 10. In other words, the day the options expired – August 11 – was not "within three months" of his termination; rather, it was already one day too late.

Even if Sheils is correct that August 11 was the last day "within three months," and thus that, under the Code, he had through August 12 to exercise his options, he still cannot prevail because the fact remains that he did *not* exercise his options in the prescribed manner on Monday, August 12, 2002. He was obligated to exercise his options in writing, and all that he did on August 12 was leave a phone message for Merrill Lynch.

C.

Sheils also argues that Pfizer prevented him from exercising his options by failing to inform him about how to exercise those options after Merrill Lynch replaced Burr as the stock options administrator. Specifically, Sheils complains, Burr failed to send him (1) the certified letter she customarily sent terminated employees and (2) the e-mail she sent employees on her last day at Pfizer, and Pfizer failed to provide him with (3) the Kit and (4) the status report indicating when his stock options expired (collectively, "the Materials") until after it was too late.

Sheils argues that Pfizer's failure to provide him with the Materials breached sections 8.01 and 8.02 of the stock option agreements. These sections require that all

8

notices, demands, requests, declarations, service of process or other communications "permitted or required under" the agreements (1) be in writing and (2) be served personally or sent by registered or certified mail. (A142, A171).

This argument fails for two reasons. First, as explained above, the stock option agreements are not contracts but rather irrevocable offers which the optionee is free to accept or reject. They thus do not impose duties on the optionor other than the obligation not to revoke the offer during the period before it expires, and the conditional obligation to follow through on the offer should the optionee accept it. Pfizer could not violate the stock option agreements unless it failed to fulfill one of those obligations.

Moreover, even if Pfizer *was* bound by sections 8.01 and 8.02, failing to provide Sheils with the Materials clearly did not run afoul of those sections. This is because these sections only apply to communications *required or permitted* under the stock option agreements. The stock option agreements certainly did not *require* Pfizer to provide Sheils with the Materials. They *permitted* Pfizer to provide Sheils with the Materials only in the sense that they did not explicitly forbid it from doing so. But the word "permitted" in the agreements common-sensically cannot refer to every communication not explicitly forbidden by them, but rather must refer only to communications they specifically mention as optional (i.e., communication they affirmatively permit).

Sheils alternately argues that he is entitled to equitable relief from the terms of the stock option agreements. This argument lacks merit. Under California law, an optionee

9

is not entitled to such relief where the failure to exercise the option results from his own neglect or inadvertence and was not contributed to by the optionor. *See Bekins Moving & Storage Company v. Prudential Insurance Company of America*, 176 Cal. App. 3d 245, 251-255 (1985); *Simons*, 93 Cal. App. 3d at 185-190. In the context of articulating this rule, courts have stressed that California law is conservative – especially in comparison to the law of other states – when it comes to relieving an optionee of the obligation to exercise his option in the precise manner and within the precise timeframe described in an option contract. *Id.* Because Sheils possessed Pfizer's phone number, Pfizer's alleged failure to provide him with the Materials cannot accurately be characterized as a "contribution" to his failure to exercise his options.

D.

In addition to his breach of contract claim, Sheils asserted that Pfizer violated the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 PA. CONS. STAT. ANN. §260.1 *et seq.* The WPCL provides in part:

> Whenever an employer separates an employee from the payroll, or whenever an employee quits or resigns his employment, the wages or compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable.

§260.5(a). The statute "provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages." *Weldon v. Kraft*, 896 F.2d 793, 801 (3d Cir.

10

1990).  The statute is inapplicable here because, even if the stock options qualify as "wages" under it, Sheils has not shown that Pfizer breached a contractual obligation to pay him earned wages.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment for Pfizer.